**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | : | No. 3:10cr-00222 (RNC) |
| v. | : | |
| ROBERT H. RIVERNIDER, JR.,<br>Defendant | : | |
| | : | December 18, 2013 |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S *PRO SE* MOTION TO DISMISS, WITHDRAW GUILTY PLEAS, ET AL**

**I. Statement of the Case and Proceedings**

**History of the Case**

The procedural history of the case at bar is highly relevant to what is essentially the defendant's virtual eve of sentencing pro se motion to withdraw his guilty pleas. Its relevance is made obvious by the fact that the Indictment charging the defendant and his co-defendants/co-conspirators was unsealed more than three years ago, and he has been awaiting sentencing following his previously entered guilty pleas for nearly 10 months notwithstanding the District's Speedy Trial Plan. Included among the more salient chronological facts in this case are the following:

On November 4, 2010, a sealed indictment was returned by a federal grand jury sitting in New Haven which charged the defendant Rivernider and his co-conspirators/co-defendants with multiple counts of wire and bank fraud. (*Docket Entry 1*). On the following day, Rivernider was arrested in the Southern District of Florida and held in pre-trial detention pending his appearance

in the District of Connecticut. On November 18, 2010, the indictment was unsealed, *Docket Entry 19*.

On December 8, 2010, Attorney Shelly R. Sadin, who had been appointed as CJA counsel for Rivernider, filed her appearance in the matter, *Docket Entry 27*, and on December 13, 2010 Attorney Sadin appeared with Rivernider for his arraignment and detention hearing.[1] *Docket Entry 29*.

On December 22, 2010, the Honorable Ellen Bree Burns issued a scheduling order in the case which included a trial date of June 14, 2011, *Docket Entry 38*, and which provided for an immediate exclusion of time under Title 18 U.S.C. § 3161(h)(7)(A). *Docket Entry 39*. The exclusion of time was based on the additional time required for the defense to review discovery in the case and pursue investigative leads, as well as the potential difficulties involved in obtaining information regarding properties located in Tennessee, Florida, New Jersey and Connecticut.

On March 17, 2011, the defendant Rivernider, who had been held without bond up until that time, was released on bond. *Docket Entry 73*. Subsequently, on April 5, 2011, the defendant's motion to continue the trial date was granted, *Docket Entry 82*, and jury selection was re-set for October 11, 2011. *Docket Entry 81*.

On March 3, 2011, Rivernider's motion to appoint what was referred to as a "Coordinating Discovery Attorney" for the case was filed, *Docket Entry 88*, and on May 25, 2011 Judge Burns granted the defendant's motion. Russell M. Aoki was appointed as Coordinating Discovery Counsel for all the defendants in the case. *Docket Entry 97*. On the

[1] During her representation of the defendant Rivernider, a second lawyer Attorney Sadin in her in that representation.

following day, an amended scheduling order was issued setting the jury trial in the defendant's case for October 13, 2011, *Docket Entry 99*.

On June 15, 2011, the defendant Rivernider filed yet another motion for extension of time, in this instance for the filing of motions. *Docket Entry 102*. On August 3, 2011, the Court found that the motion for extension of time was moot. *Docket Entry 115*.

On August 12, 2011, a status conference was scheduled in the case for September 2, 2011, *Docket Entry 111*, and on September 12, 2011, the Court entered a new calendar pushing the jury selection date from October 13, 2011 to February 14, 2012 based on the defendant's claimed need to continue to review the discovery in the case and pursue investigative leads suggested in those discovery materials. *See generally Docket Entries 112, 113, 116*.

On November 30, 2011, the case was transferred to the Honorable Alvin W. Thompson as the result of a serious injury having been sustained by Judge Burns. *Docket Entry 120*. Thereafter, Judge Thompson scheduled a status conference in the case for December 7, 2011. *Docket Entry 121*. At that status conference, the defendant Rivernider and his co-defendants again moved for a continuance in the trial date of the case, in this instance until August 9, 2012. *Docket Entry 127, 129 and 132*.

On February 17, 2012, after Judge Burns had returned to the Bench, the instant case was transferred back to her docket. *Docket Entry 140*. On February 21, 2012, Judge Burns granted the motion to continue the trial of the case and excluded the time between February 21, 2012 through August 9, 2012 under the Speedy Trial Act. Again, the basis for the continuance being to provide the defendant with additional time to review discovery in the case and, again, to pursue investigative leads. *Docket Entry 142*.

Thereafter, on February 22, 2012, the Court scheduled a status conference in the matter for March 9, 2012. *Docket Entry 143*. At that status conference, again at the request of the

defendant and his co-defendants, jury selection in the case was moved to September 11, 2012. *Docket Entry 144*.

Just three days later, on March 12, 2012, a sealed motion for Attorney Shellie R. Sadin to withdraw as counsel was filed, and an unsealed version of the motion was filed on March 13, 2012. See *Docket Entries 145, 146, 147*. The motion to withdraw as counsel was heard by Judge Burns on March 26, 2012. At the March 26, 2012 hearing, the motion to withdraw was granted based on a breakdown in communications between counsel and their client, and a new attorney, James W. Bergenn, Esq., was appointed as new counsel. *Docket Entries 153, 154*. At the time the motion to withdraw was granted and new counsel was appointed, it was represented to the Court that the defense would be prepared to proceed to trial as scheduled on September 12, 2012.

On May 23, 2012, an associate of Attorney Bergenn, namely Michael G. Chase, Esq., also filed an appearance for the defendant Rivernider. *Docket Entry 158*.

On May 24, 2012, Judge Burns scheduled yet another status conference in the case for June 5, 2012, *Docket Entry 162*, which was later continued to July 30, 2012. *Docket Entry 185*. At that status conference, again at the request of the defendant and his co-defendants, the trial date was once again moved, this time to January 8, 2013. *Docket Entries 187, 188*. Again, the basis of the continuance involved the need to review discovery in the case. *Docket Entry 189*.

On October 26, 2012, the case was transferred to this Court due to Judge Burns's partial incapacitation. *Docket Entry 230*. This Court then scheduled a status conference in the matter for November 14, 2012. *Docket Entry 233*.

At the November 14, 2012 status conference, the Court scheduled jury selection for January 8, 2013. *Docket Entry 239*, and set another status conference in the matter for December

6, 2012. The date of the status conference had to be moved several times, but did occur on December 10, 2012. *Docket Entry 265*.

On December 4, 2012, the defendant Rivernider filed yet another motion to continue jury selection. *Docket Entry 248*. On December 7, 2012, the Court scheduled a telephone conference for December 11, 2012. *Docket Entry 255*, and on December 11, 2012, the Court granted the defendant's request to continue jury selection. A firm jury selection date of was set forth on February 5, 2012. *Docket Entry 267*.

On January 4, 2013, the Court held another status conference in the case in an attempt to resolve all pending motions so the case could proceed to trial as scheduled on February 5, 2013. *Docket Entry 288*.

On January 22, 2013, a final pre-trial conference was scheduled for January 30, 2013, *Docket Entry 323*, and at the final pre-trial conference, the Court ruled on the various pending motions in the case. *Docket Entry 329*.

On February 5, 2013, well over two years after the indictment against the defendant Rivernider had been unsealed, jury selection finally began in the case. *Docket Entries 333-335*.

On February 7, 2013, evidence in the case against the defendant Rivernider and his co-defendants/co-conspirators Robert Ponte and Loretta Seneca began. *Docket Entry 338*.

On February 25, 2013, after presentation of more than half of the prosecution's evidence and on the eve of perhaps the most damaging witnesses against the defendant being called to the stand, the defendant announced his intention to plead guilty to all counts of the indictment in which he was named. On that same date, the defendant entered thoroughly canvassed guilty pleas to Counts One, Two–Eight, Nine, and Ten-Eighteen of the indictment. *Docket Entries 367, 368*. Moreover, as part of his guilty pleas, the defendant filed in open court a formal written petition seeking permission to plead guilty in the case. *Docket Entries 366, 373*.

After the guilty pleas were accepted by the Court, sentencing in the matter was set for May 21, 2013. *Docket Entry 368*. Thereafter, the court re-scheduled sentencing for June 30, 2013, *Docket Entries 424, 425.*

Later, on May 28, 2013, the Court again re-scheduled sentencing and set the new date for August 10, 2013. *Docket Entry 444*.

On July 12, 2013, the defendant filed a motion to continue sentencing, *Docket Entry 466*, and on July 15, 2013, the motion was granted. *Docket Entry 467.*

On August 13, 2012, the court scheduled a pre-sentencing hearing in the matter for September 4, 2013. *Docket Entry 484*. The September 4, 2012, hearing focused on the question of "loss" in the case, *Docket Entry 498.* On September 13, 2013, the Court re-scheduled sentencing in the case for October 28, 2013. *Docket Entry 507.*

On October 25, 2013, the Court conducted an additional status conference in advance of sentencing, *Docket Entry 521, 527*. During the October 25, 2013 telephone status conference, the defendant's new motion to continue sentencing once again was taken under advisement, *Docket Entry 527*, and later that day the Court scheduled a further evidentiary hearing and sentencing in the matter for December 4 and 5, 2013. *Docket Entries 528, 529*.

On December 4 and 5, 2013, the Court conducted an evidentiary hearing relating to the defendant's request for a downward departure from his applicable Guideline range pursuant to U.S.S.G. § 5K2.13 (Diminished Mental Capacity). *Docket Entries 550, 557, 559, 560, 561 and 562*. At the conclusion of the hearing on December 5, 2013, the Court advised that it could not find that the defendant has met his burden regarding proof that he was suffering from diminished capacity and, in particular, from an executive functioning deficit. The Court rescheduled the sentencing date in the Rivernider matter for December 18, 2013. *Docket Entry 553*.

On the afternoon of December 5, 2013, after the Court had advised the parties, with the defendant present, that it would not depart based on the defendant's claimed diminished mental capacity, the parties were advised that Rivernider had approached Chambers and then the Clerk's office seeking to discharge his counsel and file a pro se motion to withdraw his guilty pleas. Thereafter, on December 10, 2013, counsel for the defendant Rivernider, James W. Bergenn, filed a motion to withdraw from the case. *Docket Entry 563*. On that same day, the Court denied the motion to withdraw (without prejudice) pending a showing of good cause. *Docket Entry 564*.

On December 12, 2013, Attorney Bergenn filed a motion for leave for the defendant Rivernider to file a pro se motion to withdraw his pleas and to allow counsel to continue to appear as stand-by counsel. *Docket Entry 566*.

On December 13, 2013, the Court granted the defendant an opportunity to file a pro se motion to withdraw his guilty plea provided the motion was filed by no later than 9:00 a.m. on December 17, 2013. The Court denied counsel's request to serve as stand-by counsel to Rivernider, and ordered that Attorney Bergenn remain as counsel in the case, except for purposes of filing the pro se motion to withdraw that the defendant claimed he intended to file. *Docket Entry 568*.

On the afternoon of December 16, 2013, the defendant filed a 53-page document entitled "Robert H. Rivernider, Jr., pro se, Motion to Withdraw Guilty Plea and Motion for Dismissal of Indictment with Prejudice or for a New Trial Due to Egregious Prosecutorial Misconduct and Ineffective Assistance of Council [sic] in Order to Correct a Manifest Injustice," together with various attachments to the motion. *Docket Entry571*. The motion contained a veritable smorgasbord of alleged missteps, misconduct and ineffectiveness on the part of the prosecutors, investigators, witnesses and defense counsel.

In addition to the foregoing events, the record reflects that the defendant filed and the Court granted innumerable requests to incur expenses in the preparation of his defense case. While the motions to incur expenses were sealed, and, therefore, their contents have not been made known to the Government, it has become clear that at least some of those expenses included the cost of hiring private investigators, sending investigators to conduct interviews in out of state locations, including, but presumably not limited to, the states of Tennessee and Florida, the hiring of defense experts to examine and then opine on the defendant's purported diminished mental capacity, and the like. Indeed, it has been rumored that more than $1 million in CJA funds have been spent on behalf of the defendant in his case, an amount that very, very few people who retain private counsel in criminal cases would ever be able to afford.

**Defendant's Guilty Pleas**

Under Federal Rule of Criminal Procedure 11(b)(1), the Court may place the defendant under oath and "must address the defendant personally in open court" before accepting a plea of guilty or nolo contendere. The Court must inform the defendant of, and determine that the defendant understands, the following:

> **(A)** the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath; **(B)** the right to plead not guilty, or having already so pleaded, to persist in that plea; **(C)** the right to a jury trial; **(D)** the right to be represented by counsel--and if necessary have the court appoint counsel--at trial and at every other stage of the proceeding; **(E)** the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; **(F)** the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere; **(G)** the nature of each charge to which the defendant is pleading; **(H)** any maximum possible penalty, including imprisonment, fine, and term of supervised release; **(I)** any mandatory minimum penalty; **(J)** any applicable forfeiture; **(K)** the court's authority to order restitution; **(L)** the court's obligation to impose a special

> assessment; **(M)** in determining a sentence, the court's obligation to calculate the applicable sentencing-guideline range and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a); **(N)** the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence; and **(O)** that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Fed. R. Crim. P. 11(b)(1)(A)-(O).

In this case, the defendant Rivernider was first required to submit to the Court a petition to enter a plea of guilty before the change of plea hearing. Def.'s Pet. to Enter a Plea of Guilty. Once accepted, the Court thoroughly addressed each required element of each offense to which the defendant was entering guilty pleas and carefully canvassed the defendant to insure his pleas were being entered voluntarily, knowingly and a full understanding of the consequences of entering his guilty pleas. See Tr. of Change of Plea Hr'g at 4 (informing and establishing the defendant's understanding of 11(b)(1)(A)); Id. at 9-10 (informing and establishing the defendant's understanding of 11(b)(1)(B); Id. at 10 (fulfilling 11(b)(1)(C)); Id. (fulfilling 11(b)(1)(D)); Id. at 10-11 (fulfilling 11(b)(1)(E)); Id. at 12-14, 30 (fulfilling 11(b)(1)(F)); Id. at 17-23 (fulfilling 11(b)(1)(G)); Id. at 23-26 (fulfilling 11(b)(1)(H)); Id. at 10 (fulfilling 11(b)(1)(I)); Id. at 24-27 (fulfilling 11(b)(1)(J)); Id. at 25-26 (fulfilling 11(b)(1)(K)); Id. at 24-25 (fulfilling 11(b)(1)(L)); Id. at 27-30 (fulfilling 11(b)(1)(M)); Id. at 30 (fulfilling 11(b)(1)(N)); Id. at 5 (fulfilling 11(b)(1)(O) by noting that the defendant is a United States citizen).

**II. Statement of Law and Applicable Standards**

With respect to the defendant's principal claim relating to his motion to withdraw his guilty pleas, the Government respectfully notes the following:

Under Federal Rule of Criminal Procedure 11(d)(2)(B), "a defendant who seeks to withdraw his or her plea bears the burden of showing that there are valid grounds for withdrawal." United States v. Couto, 311 F.3d 179, 185 (2d Cir. 2002); see also United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992); United States v. Schmidt, 373 F.3d 100, 102 (2d Cir. 2004). Further, "a defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence[,] *if . . . the defendant can show a fair and just reason for requesting the withdrawal*." United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997) (emphasis added). It is not sufficient that "a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed." Gonzalez at 1100. As the Second circuit has repeatedly noted, the standard for withdrawing a guilty plea is stringent because "society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." Schmidt at 103 (citing Maher at 1529) (citation, internal quotation marks, and alteration omitted).

In this regard, the Second Circuit has recognized three primary factors constituting "fair and just reason" for withdrawal,

> [i]n general, to determine whether the defendant has shown a "fair and just reason" to justify withdrawal, a district court considers, *inter alia:* (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea.

Id. at 102-103 (quoting Couto at 185).

The Government, however, is "not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient

grounds for permitting withdrawal." Gonzalez at 1100. The Court may also consider whether the defendant has "raise[d] a significant question about the voluntariness of the original plea." United States v. Torres, 129 F.3d 710, 715 (2d Cir.1997).

Even where the defendant provides a fair and just reason to withdraw his guilty plea, however, "a defendant has no absolute right to withdraw his plea of guilty." United States v. Williams, 23 F.3d 629, 634 (2d Cir.1994). Indeed, "large discretion" is given to the district court judge by virtue of "the much better "feel of the case" possessed by the judge who observed the defendant at the taking of the plea." United States v. Saft, 558 F.2d 1073, 1082 (2d Cir. 1977).

## III. Discussion

An examination of the full record in the instant matter as it relates to the three factors identified in Schmidt as those a district court needs to consider in making a determination as to whether a defendant should be permitted to withdraw previously entered guilty pleas reflects the following:

### *A. Assertion of Legal Innocence*

The defendant's contentds that he is not guilty because (1) his "objective was to help" and (2) he did not intend to cause harm do not constitute a fair and just reason for withdrawal of a guilty plea under the standard set forth by the Second Circuit. Def.'s Mot. for Permission to File a *Pro Se* Mot. to Withdraw His Plea at 1,2. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." Torres at 715; *see also* Gonzalez at 1100 ("No hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory"). Rather, the Court must defer to the defendant's previous admissions,

> [t]he self-inculpatory statements [the defendant] made under oath at his plea allocution "carry a strong presumption of verity," Blackledge v. Allison, 431 U.S. 63, 74, 97 (1977), and the court, in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant, especially when, as here, the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing his wrongdoing and acknowledging that he could not effectively defend against that evidence.

Maher at 1530.

Therefore, the Court must give considerable weight to Mr. Rivernider's guilty plea and his plea allocution for "a guilty plea is an unconditional admission of guilt and constitutes an admission of all the elements of a formal criminal charge." United States v. Rosen, 409 F.3d 535, 549 (2d Cir. 2005) (internal citations omitted) (noting "despite the post-plea self-serving statements that Rosen did not know of the overall design or scheme . . . and that he had no intent to defraud . . . the record of Rosen's allocution and plea of guilty conclusively established that he knew all of the elements of the offenses with which he was charged . . .); see also United States v. Jacobs, 550 F.Supp. 2d 302, 308 (D.Conn. 2008) ("[the defendant's] position that he is innocent of conspiracy amounts to no more than advocating an alternative theory of the evidence which he could have presented at trial and argued to the jury . . . . Jacobs chose to admit the necessary elements of the crime of conspiracy, and, rather than dispute the veracity or voluntariness of these admissions, he now urges that certain recent developments-really, recent reinterpretations of already-existing evidence-show his innocence. This argument falls short"); United States v. Hirsch, 239 F.3d 221, 225 (2d Cir.2001) (concluding that the defendant's claims of innocence in his motion to withdraw plea were unavailing given that the claims were "wholly conclusory" and that the defendant failed to explain how the facts alleged in his affidavit in support of his motion would demonstrate his innocence).

In the instant case, Mr. Rivernider did not put forth this "intent to help" assertion at his plea hearing, nor did he assert it in his "Admission of Offense Conduct" as part of his "Petition to

Enter Plea of Guilty." On the contrary, in his "Admission of Offense Conduct," he admitted, for example, to,

> *knowingly* and *willfully* participat[ing] in the obtaining of monies from [No More Bills] clients in that he knew clients [listed in Counts two through eight] were led to believe that almost all of their monthly payments . . . were being made from realized returns on already actively paying investments when they were not, thereby specifically intending to deceive [No More Bills] clients in that he knew the clients would be placing their funds at a risk of loss more substantial than the risk represented to them, and he took their funds without insuring the clients were properly informed.
> . . .
> Rivernider frequently marked up to the appraised value price the seller's agreed net amount to receive on the properties, often by as much as twenty-five percent, without disclosing the increase in the seller's agreed net amount.
> . . .
> Rivernider did not inform the foregoing individuals that investment returns had not been realized and did not notify them of the risk that Rivernider would be unable to cover carrying costs associated with the properties for the time period promised if the rental income could not cover those costs.

Def.'s Admis. of Offense Conduct at 1,2,3.

Even if this Court were to believe that the defendant did not intend to harm his victims, he still would be guilty of the offenses to which he voluntarily pleaded guilty.

> Sufficient intent to inflict harm can be found from the intentional withholding of information from a lender which lowers the value of the transaction due to the lender's lack of information pertinent to the accurate assessment of the risk it faces and the propriety of extending credit to that particular individual, and because of the increased expense and difficulty of any necessary bill collection efforts. Because this intent is sufficient, it is irrelevant whether the borrower intended in good faith to repay the loan.

United States v. Karro, 257 F.3d 112, 118 (2d Cir. 2001) (noting the fact that the defendant "lacked the intent to fail to repay the money she charged on the fraudulently-obtained credit cards is irrelevant to her guilt."); See United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended

to inflict a genuine harm upon the bank-i.e., to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant."); United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996); United States v. Dinome, 86 F.3d 277, 280, 284 (2d Cir. 1996).

*B. Amount of Time Elapsed*

Although Mr. Rivernider's change of plea hearing occurred on February 25, 2013, he did not file his motion for permission to file his *pro se* withdrawal of his guilty plea until December 16, 2013, almost ten months later. No reasons were provided for waiting until after the Court made known to the parties on December 5, 2013 that it did not intend to depart from the applicable Guidelines range based on a purported "diminished mental capacity." In fact, the defendant did not actually file his *pro* se motion until two days before his long delayed sentencing was scheduled. As noted by the District Court in Rosen,

> [s]uch a strategic maneuver is plainly contrary to the rationale for plea withdrawal, which is "to permit [a defendant] to undo a plea that was unknowingly made at the time it was entered," "not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty."

Rosen at 547 (citing United States v. Rosen, No. 02 CR. 1246, 2004 WL 1234037 (June 2, 2004) at *3) (finding that the motion for withdrawal had not been made promptly and denying it); see also United States v. Piris, 599 F.Supp.2d 205, 215 (D.Conn. 2009) ("Mr. Piris did not act promptly in informing the Court and the Government of his desire to withdraw his guilty plea. Nearly five months passed from the time of the guilty plea to the time Mr. Piris informed the Government of his desire to withdraw his plea."); United States v. Doe, 537 F.3d 204, 213 ("Whereas a "swift change of heart" may "indicate[a] plea made in haste or confusion," Gonzalez at 1100, the fact that the defendant waited five months to file his motion

strongly supports the district court's finding that his plea was entered voluntarily."); United States v. Grimes, 225 F.3d 254, 259 (2d Cir. 2000) (finding no abuse of discretion in denying the defendant's motion to withdraw his guilty plea where the defendant waited "almost five months" before indicating that he wished to do so).

*C. Prejudice to the Government*

As the Second Circuit has held, the Government is "not required to show prejudice when opposing a defendant's motion to withdraw a guilty plea where the defendant has shown no sufficient grounds for permitting withdrawal." Gonzalez at 1100. "'Prejudice' in the context of plea withdrawal typically refers to depriving the Government of the benefit of its bargain by having the burden of trial preparation suddenly thrust upon it [or in this case *re*-thrust], as well as the potential difficulty to the Government in securing evidence against the defendant that would have been easier to secure at an earlier moment in time." United States v. Lopez, 385 F.3d 245, 254 (2d Cir.2004). Although it is not required for the Government to demonstrate prejudice in this case, it should be noted that granting the motion to withdraw the plea of guilty and requiring a new trial would be prejudicial to the Government.

As noted in the District Court and affirmed by the Second Circuit in Maher, the present case is distinguishable,

> from cases in which there is no prejudice to the government from allowing withdrawal of a plea, improvidently made, before trial. Here, the plea was not made until after the defendants and jury had sat through extensive testimony from over a score of witnesses, many transported . . . at considerable expense. Allowing withdrawal of the plea at this juncture would severely prejudice the government, which has displayed its case in full and would be forced substantially to repeat it.

Maher at 1520. The defendant in this case already put the Government to its burden once by requiring it to put on several weeks of evidence before he pleaded guilty. To make the Government put on a second trial would "necessitat[e] a second round of evidence preparation,

the recalling of witnesses, and further exhaustion of prosecutorial resources" and thereby would be prejudicial. United States v. Grzybek, 283 Fed. Appx. 843, 845 (2d Cir. 2008); see also United States v. Danzi, 726 F.Supp.2d 120, 134 (D.Conn. 2010) (noting that forcing the Government to put on a second trial "would mean that the memories of the witnesses the Government would call to prove Mr. Danzi's guilt would have faded by more than 14 months").

Because the defendant has failed to meet his burden of proof as to any of the three Schmitz factors, it is respectfully submitted that the defendant's motion to withdraw should be denied.

## IV. Defendant's Additional Claims

**There was no Sixth Amendment violation of Mr. Rivernider's right to be properly informed of the nature and cause of the accusations against him**

I. Despite Mr. Rivernider's assertion that he "never sought Victim Investors to invest monies with them," he contradicts himself in his Admission of Offense Conduct. Def.'s Mot. to Withdraw Guilty Plea at 2. "In or about October 2007, Rivernider and Ponte agreed to continue to operate the NMB program, and *continued to solicit new client money* . . . ." (emphasis added) Def.'s Admis. of Offense Conduct at 1. In light of the guilty plea, the defendant's "self-inculpatory statements made under oath at his plea allocution "carry a strong presumption of verity," Blackledge v. Allison, 431 U.S. 63, 74, 97 (1977), and the court, in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the Government and against the defendant." United States v. Maher, 108 F.3d 1513, 1530 (2d Cir. 1997).

II. The defendant's contention regarding the "Recipe for NMB Disaster" email is not an assertion of legal innocence, and, therefore, is irrelevant in this determination of his

withdrawal of his guilty plea. Furthermore, even if it is relevant to the question of actual innocence, the content of the email itself contradicts his claims,

> When Michael puts money *into the NMB program*, I have to take air, pay a commission on it, and then pay Michael real cash every month until infinity.
> . . .
> So Michael takes the $40,000 that was his override on the lost money *puts it into NMB*. . . .
> . . .
> How long can *NMB* sustain that?
> . . .
> How much money is being paid out by *NMB* on money that never came *into NMB?*
>
> Gov't.'s Ex. 48A at 1,2.

The defendant does not make a cognizable claim of witness tampering. He does not allege tampering with a specific witness, which is required under 18 U.S.C. § 1512. Furthermore, he provides no evidence that the prosecution "alter[ed], destroy[ed], mutilate[d], or conceal[ed] a record, document or other object, or attempt[ed] to do so." 18 U.S.C. § 1512(c)(1), but rather, he freely admits the document was provided at trial.

III. The defendant's objection to James Reid's inclusion in the Court's loss calculation is not an assertion of legal innocence and, therefore, is irrelevant in the determination of his withdrawal of his guilty plea.

IV. Again, Mr. Rivernider has failed to assert a "fair and just reason" for withdrawing Counts One through Eight of his guilty plea, and, therefore, has not met his burden. He has not proven any of three elements required under <u>Schmidt</u>. First, he has given no justification for the excessive delay of almost 10 months between his plea hearing and filing his motion for withdrawal. Secondly, he has not made a claim of legal innocence. And thirdly, allowing the defendant to withdraw his guilty plea would be prejudicial to the Government .

V. Mr. Rivernider's contention that an allegation regarding what he "told Ms. Wade not to tell the lenders is false" does not meet the standard of an assertion of legal innocence under

Schmidt. "A reference to corroborating facts—as opposed to a 'bald statement' of innocence—is essential if a court is to credit a defendant's present claims of innocence ... over his prior (and now contradicted) admissions of guilt *under oath.*" United States v. Minter, 2011 WL 1831232 (D. Conn. April 18, 2011) (citing Torres, 129 F.3d at 715) (emphasis in original). The defendant simply states that her allegation was false but provides no corroborating evidence.

VI-XI. Mr. Rivernider's claims regarding Ms. Wade's allegedly perjured testimony do not meet the "extraordinary circumstances" standard to overturn his conviction.

> Reversal of a conviction based upon allegations of "perjured testimony should be granted only with great caution and in the most extraordinary circumstances." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992); see also United States v. Moore, 54 F.3d 92, 99 (2d Cir.1995). Reversal is not justified unless the appellant establishes four matters: (i) the witness actually committed perjury, see United States v. Helmsley, 985 F.2d 1202, 1205 (2d Cir.1993); (ii) the alleged perjury was material, see United States v. Wallach, 935 F.2d 445, 456 (2d Cir.1991); (iii) the government knew or should have known of the alleged perjury at time of trial, see id.; and (iv) the "perjured testimony remained undisclosed during trial, ..." United States v. Blair, 958 F.2d 26, 29 (2d Cir.1992).
>
> United States v. Zichettello, 208 F.3d 72, 102-03 (2d Cir. 2000).

The defendant has not met his burden to prove that Ms. Wade "willfully and contrary to such oath states or subscribes any material matter which [s]he does not believe to be true." 18 U.S.C.A § 1621(1). For example, he asserts that "Rivernider does not curse," Def.'s Mot. to Withdraw Guilty Plea at 4, and therefore, Ms. Wade was lying. But as demonstrated in Gov't Ex. 354, he reacted to receiving bad checks by writing, "More bad FUCKING checks, thanks piece of shit Nigeria fucking scammers." (emphasis in original). Furthermore, he does not demonstrate how the alleged perjury is material. Finally, even if the Government should have known of the alleged perjury at the time of trial, the fact that the defendant "knew of the purported discrepancy in [Wade's] testimony and the evidence offered in support of that

testimony" and had "ample opportunity to rebut [Ms. Wade's] testimony and undermine [her] credibility," means that his claim for reversal fails because the jury "was thus aware of the dispute [regarding the testimony]." Zichettello at 102 (quoting Blair at 29).

XI. Mr. Rivernider has failed to assert a "fair and just reason" for withdrawing Counts Nine through Eighteen of his guilty plea and therefore, has not met his burden. He has not proven any of three elements required under Schmidt. First, he has given no justification for the excessive delay of almost 10 months between his plea hearing and filing this motion. Secondly, he has not made an adequate claim of legal innocence. And thirdly, allowing him to withdraw the defendant to withdraw his guilty plea would be prejudicial to the Government .

**Mr. Rivernider's contention of "good faith" and a lack of mens rea are both factually incorrect and legally irrelevant.**

I.-X. The defendant's contentions that he is not guilty because (1) he allegedly acted in "good faith" and (2) he did not intend to cause harm do not constitute a fair and just reason for withdrawal of a guilty plea under the standard set forth by the Second Circuit. Def.'s Mot. to Withdraw Guilty Plea at 6. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." Torres at 715; *see also* Gonzalez at 1100 ("No hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory"). Rather, the Court must defer to the defendant's previous admissions,

> [t]he self-inculpatory statements [the defendant] made under oath at his plea allocution "carry a strong presumption of verity," Blackledge v. Allison, 431 U.S. 63, 74, 97 (1977), and the court, in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant, especially when, as here, the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing

> his wrongdoing and acknowledging that he could not effectively defend against that evidence.

Maher at 1530.

Therefore, the Court must give considerable weight to Mr. Rivernider's guilty plea and his plea allocution for "a guilty plea is an unconditional admission of guilt and constitutes an admission of all the elements of a formal criminal charge." United States v. Rosen, 409 F.3d 535, 549 (2d Cir. 2005) (internal citations omitted) (noting "despite the post-plea self-serving statements that Rosen did not know of the overall design or scheme . . . and that he had no intent to defraud . . . the record of Rosen's allocution and plea of guilty conclusively established that he knew all of the elements of the offenses with which he was charged . . .); see also United States v. Jacobs, 550 F.Supp. 2d 302, 308 (D.Conn. 2008) ("[the defendant's] position that he is innocent of conspiracy amounts to no more than advocating an alternative theory of the evidence which he could have presented at trial and argued to the jury . . . . Jacobs chose to admit the necessary elements of the crime of conspiracy, and, rather than dispute the veracity or voluntariness of these admissions, he now urges that certain recent developments-really, recent reinterpretations of already-existing evidence-show his innocence. This argument falls short"); United States v. Hirsch, 239 F.3d 221, 225 (2d Cir.2001) (concluding that the defendant's claims of innocence in his motion to withdraw plea were unavailing given that the claims were "wholly conclusory" and that the defendant failed to explain how the facts alleged in his affidavit in support of his motion would demonstrate his innocence).

In the instant case, Mr. Rivernider did not put forth this "good faith" assertion at his plea hearing, nor did he assert it in his "Admission of Offense Conduct" as part of his

"Petition to Enter Plea of Guilty." On the contrary, in his "Admission of Offense Conduct," he admitted to,

> *knowingly* and *willfully* participat[ing] in the obtaining of monies from [No More Bills] clients in that he knew clients [listed in Counts two through eight] were led to believe that almost all of their monthly payments . . . were being made from realized returns on already actively paying investments when they were not, thereby specifically intending to deceive [No More Bills] clients in that he knew the clients would be placing their funds at a risk of loss more substantial than the risk represented to them, and he took their funds without insuring the clients were properly informed.
> . . .
> Rivernider frequently marked up to the appraised value price the seller's agreed net amount to receive on the properties, often by as much as twenty-five percent, without disclosing the increase in the seller's agreed net amount.
> . . .
> Rivernider did not inform the foregoing individuals that investment returns had not been realized and did not notify them of the risk that Rivernider would be unable to cover carrying costs associated with the properties for the time period promised if the rental income could not cover those costs.
>
> Def.'s Admis. of Offense Conduct at 1,2,3.

Even if this Court is to believe that the defendant did not intend to harm his victims, he still may be found guilty.

> Sufficient intent to inflict harm can be found from the intentional withholding of information from a lender which lowers the value of the transaction due to the lender's lack of information pertinent to the accurate assessment of the risk it faces and the propriety of extending credit to that particular individual, and because of the increased expense and difficulty of any necessary bill collection efforts. Because this intent is sufficient, it is irrelevant whether the borrower intended in good faith to repay the loan.
>
> United States v. Karro, 257 F.3d 112, 118 (2d Cir. 2001) (noting the fact that the defendant "lacked the intent to fail to repay the money she charged on the fraudulently-obtained credit cards is irrelevant to her guilt."); See United States v. Rossomando, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank,

the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank-i.e., to deprive the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit to the defendant."); United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996); United States v. Dinome, 86 F.3d 277, 280, 284 (2d Cir. 1996).

XI. Although the defendant has alleged that Wells Fargo knew about the illicit rental scheme, he has provided no evidence to support this assertion. Furthermore, even if Wells Fargo was engaging in "shoddy underwriting" as a general practice per Mr. Rivernider's assertion, there is no evidence that it occurred in this case. Therefore, this allegation does not reach the level of a showing of legal innocence and the motion to withdraw his guilty plea should be denied. Furthermore, multiple financial institutions were defrauded in this scheme and therefore, even if the allegations are true with regard to Wells Fargo, the fraud still stands on the other counts.

**Bill of Particulars**

Judge Burns carefully canvassed the defendant under Federal Rule of Criminal Procedure 11(b)(1) and determined that Mr. Rivernider understood what crimes he was being charged with, the element of each crime that the Government would have to prove at trial, and that he could satisfactorily allocute to the offenses charged. Tr. of Plea Hearing. Mr. Rivernider then pleaded guilty to each separate count of the indictment. Therefore, the defendant's contention he "still is unsure as to the actual crimes [he] committed" is, at best, far-fetched.

Furthermore, even if the defendant's contentions regarding the Bill of Particulars are correct, the issue of timeliness bars this claim. Ms. Sadin moved to withdraw as counsel on March 13, 2012 and it was granted on March 26, 2012 at which point Mr. Bergenn became

defense counsel. Def.'s Mot. to Withdraw Appearance of James W. Bergenn at 1. The defendant gives no reason why this issue could not have been raised with Mr. Bergenn once he was appointed in 2012 or any point before the defendant decided to plead guilty.

**The Crime Victims Rights Act (CVRA) and the Mandatory Victims Restitution Act (MVRA) are <u>not</u> relevant in this matter.**

The defendant's discussion of the CVRA and MVRA is not an assertion of legal innocence or that his plea was involuntary and, therefore, is not relevant. He does not assert that Mr. Praise committed the crimes for which he is accused but just claims that he was a victim in a separate crime. At best, it is a potential mitigating factor with regards to sentencing but should not factor into the court's decision regarding the defendant's guilty plea or the underlying indictment.

**The Prosecution <u>did not</u> withhold exculpatory evidence.**

I. The defendant provides no evidence of an alleged "scheme" between the prosecutors in this case and the Praise case other than his bald assertion. Furthermore, the victim letter would not be tantamount to an assertion of legal innocence and therefore, is irrelevant with respect to his guilty plea. Furthermore, Mr. Rivernider has demonstrated no irreparable harm from the letter's alleged withholding and therefore, there is no basis to dismiss the indictment.

II. According to the defendant himself, the prosecution did not withhold the Bank of America records from the parties. "[T]he prosecution, as well as defense counsel, failed to obtain the records." Def.'s Mot. to Withdraw Guilty Plea at 15. Therefore, there is no withholding of information since the prosecution did not have it and the defense themselves also subpoenaed it.

III. The defendant provided no evidence to support his unfounded allegation that the prosecution withheld records from Tennessee State Bank. In addition, the defendant provides no evidence that the documents are exculpatory. Furthermore, the defendant failed to demonstrate a "resulting harm to defendants" from the alleged omission. Fields at 640 ("[W]e fail to see any resulting harm to defendants. By that time defendants, with their backs to the wall because of the New York County District Attorney's anticipated reference of the matter to the SEC, had long since disclosed enough facts to the SEC to enable the Government to marshal the evidence and to proceed both civilly and criminally against them.").

IV. Although the defendant argues that the prosecution should have subpoenaed Mr. Reid's mortgage documents, the defense could have easily done so if they wanted to use the information during the trial for cross-examination. Furthermore, the defense would have had the opportunity to cross-examine Mr. Reid had they not made the choice to plead guilty. Finally, the defendant does not allege that these documents would prove his legal innocence. Therefore, they provide no basis for making a finding for the defendant regarding his guilty plea or indictment.

V. The defendant provided no evidence to support his unfounded allegation that the prosecution withheld Mr. Fallow's phone records. In addition, the defendant provides no evidence regarding how the documents are exculpatory. Furthermore, the defendant fails to demonstrate a "resulting harm to defendants" from the alleged omission. Id.

VI. The defendant provided no evidence to support his unfounded allegation that the prosecution withheld Ms. Walters account statements. In addition, the defendant provides no evidence regarding how the documents are exculpatory or prejudicial to him.

**There was <u>no</u> perjured testimony or false declaration made before the Grand Jury and the claim is barred for timeliness.**

The defendant has provided no justification for the excessive delay of almost 10 months between his plea hearing and filing this motion. If he really is a "trained criminal defense investigator" per his contention, Def.'s Mot. to Withdraw Plea at 18, and noticed these errors early on, then his delay is especially puzzling. In order to dismiss an indictment for a witness's alleged perjury before the grand jury, the defendant must prove the materiality of the perjury,

> The test of materiality in a grand jury's investigation is whether the false testimony has a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation, and, if it does, an indictment for perjury may be predicated upon it.

<u>Carroll v. United States</u>, 16 F.2d 951, 953 (2d Cir. 1927).

With a plethora of evidence to support every charge in the indictment, none of the defendant's allegations of perjury meet the requirement of materiality.

I.-V. The defendant failed to demonstrate how the grand jury testimony he cites is material to the indictments or to provide any corroborating evidence for his perjury allegations other then his own bald assertions. Furthermore, he does not assert "that the grand jury had insufficient information to support its decision to hand down the indictment" even if his additional facts were included. Finally, he does not demonstrate that the prosecution knew that this testimony was allegedly perjured. <u>United States v. Basurto</u>, 497 F.2d 781,785-86 (9th Cir. 1974).

VI. There is no corroboration of the defendant's contention that the mortgage amount was misstated. There are no records from April 17, 2007 listed in the defendant's attached exhibits and therefore, the court is only left with the defendant's assertion which stands contrary to facts in the record.

**The statements made to obtain the search warrant were <u>not</u> false.**

The defendant did not meet the required showing that a false statement was made in support of a search warrant. The defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978)

The defendant acknowledges that Special Agent West swore in his affidavit "the account was closed out by Ponte *and/or* Rivernider." Def.'s Mot. to Withdraw Guilty Plea at 27 (emphasis added). Therefore, even if Ponte did not close the account and it was only done by Rivernider – a fact which he does not contest – then SA West's statement was not untrue. Furthermore, Mr. Rivernider provides no evidence that there was "reckless disregard for the truth" or that the statement was *necessary* to the finding of probable cause rather than simply sufficient. As a result, Mr. Rivernider failed to prove that SA West's sworn statement was false and therefore, the indictment should stand.

**The prosecution did not suborn perjury.**

Under 18 U.S.C. § 1621 (1982), "in order to constitute the offense of subornation of perjury, perjury must have been actually committed." See also United States v. Brumley, 560 F.2d 1268, 1278 n. 5 (5th Cir.1977); United States v. Tanner, 471 F.2d 128, 135 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). As noted earlier, perjury is defined as "willfully and contrary to such oath stat[ing] or subscribe[ing to] any material matter which [s]he does not believe to be true." 18 U.S.C.A § 1621(1). The defendant repeatedly fails to demonstrate the willfulness prong in his allegations and therefore, they should not be considered.

Furthermore, even if this Court does make a finding of perjury, the defendant has not made a sufficient showing to reverse his conviction. As noted earlier,

> Reversal is not justified unless the appellant establishes four matters: (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at time of trial; and (iv) the "perjured testimony remained undisclosed during trial, ..."
>
> United States v. Zichettello, 208 F.3d 72, 102-03 (2d Cir. 2000) (internal citations omitted).

The defendant presents no evidence with regards to prongs two, three, and four and therefore, the conviction should not be reversed even if there is a finding of suborned perjury.

I. The defendant has provided no evidence that Ms. Walters committed perjury in that she willfully misstated her position regarding having seen her statements. She may well have believed her statement was true and did not recall sending an email to Mr. Sawran. Without proof that perjury was committed, the prosecutors could not have suborned perjury.

II. The defendant has provided no evidence that Mr. Fallow committed perjury in that he willfully misstated the extent of the contact between himself and Mr. Rivernider. He may well have believed his statement was true especially considering his testimony at trial took place years after the phone calls/email in question. Without proof that perjury was committed, the prosecutors could not have subornd perjury.

III. The defendant has provided no evidence that the FBI agent committed perjury in that he willfully misstated that the phones he found were cell phones rather than house phones. The fact that the defendant himself acknowledges that the phones were portable, not plugged in at the time of the search, and found on the floor would certainly lend credence to the notion that the agent made an honest mistake. Without proof that perjury was committed, could not have suborned perjury.

IV. None of the statements made by Ms. Wade cited by the defendant constitute perjury. The defendant has provided no evidence that Ms. Wade committed perjury in that she willfully misstated anything to which she testified. She may well have believed her statements were

true especially considering her testimony at trial took place years after the interactions in question. As the defendant himself notes, "Ms. Wade and the Selby's [*sic*] are *mistaken* about whom they were referring to, or who name SA West's [*sic*] wrote in the 302's." Def.'s Mot. to Withdraw Guilty Plea at 32 (emphasis added). He also does not categorically deny that the conversations about stacking could have taken place, rather he notes it is "unlikely that these open conversations took place." Id. at 33. If the defendant cannot even state with certainty what occurred in these conversations, then a charge of perjury cannot be sustained because there is no element of willfulness. Without proof that perjury was committed, The prosecutors could not have suborn perjury.

The defendant's contentions regarding Ms. Flores do not allege perjury but rather his own disbelief at the witness's testimony and therefore, should be disregarded. This is also the case with Ms. Gold's testimony as the defendant simply asserts that AUSA Schmeisser "clearly mislead the grand jury" based on a single excerpt from her testimony without any additional evidence. Id. at 34.

**The prosecution's remarks were harmless and are not a basis for overturning a proper conviction.**

The defendant's assertions regarding AUSA Durham's remarks do not meet any of the standards set forth for determining prosecutorial misconduct.

> "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 105 S.Ct. 1038 (1985). To warrant reversal, the prosecutorial misconduct must cause the defendant "substantial prejudice" by "'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" See United States v. Shareef, 190 F.3d 71, 78 (2d Cir.1999) (internal citations omitted). . . In assessing whether prosecutorial misconduct caused "substantial prejudice," this Court has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct. Id.

United States v. Elias, 285 F.3d 183, 190 (2002).

The defendant has made no effort to provide any evidence that any of these three prongs are met to justify reversing his conviction.

The alleged severity of the prosecutor's conduct is mitigated because it was "an aberration in an otherwise fair proceeding." Id. at 191; see United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995) ("[M]ost of the cases in which we have reversed convictions as a result of prosecutorial misconduct have involved repeated improper statements whose aggregate effect was more likely to undermine the fairness of the trial."); United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) ("The first question is whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice.") (internal quotation marks omitted). The defendant alleges two minor incidents of supposed misconduct over the course of a multi-week trial and does not assert that they were on-going acts. Therefore, the severity prong has not been met.

The defendant does not address the issue of a curative instruction to the jury but there was limited opportunity to give one since the defendant decided to admit his guilt and therefore, the jury was never charged. Furthermore, the defendant provides no evidence that these incidents happened before the jury and therefore, a curative might not have been needed.

The third factor, the certainty of conviction, "weighs heavily in favor of the government." Elias at 192 ("To prevail, Elias had to show that, absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), Elias would not have been convicted."). In this case, the defendant ultimately pleaded guilty and has made no assertion that these alleged acts of misconduct influenced his decision to do so. Furthermore, "the specific remarks at issue did not touch upon or bolster the most potent of the government's

evidence" as they did not occur during crucial testimony regarding the defendant's guilt and there was ample strong evidence supporting the defendant's guilt. Id.

**The prosecution did not tamper with witnesses.**

As noted earlier, the "recipe" email to which the defendant refers *repeatedly* mentions the No More Bills program and therefore, there was no inaccurate information conveyed. Furthermore, the defendant does not tie his allegation to a specific witness, which is required by statute, or provide any evidence of the alleged "improper influence" due to witness tampering. In addition, Mr. Rivernider's contentions regarding the Teamsters have no bearing on the issue of his indictment or withdrawal of his guilty plea and should be disregarded.

**The prosecution did not file false loss calculation spreadsheets with the court.**

The defendant's claims regarding the loss calculation are not a claim of actual innocence and therefore, are not relevant to his guilty plea and should be disregarded. Even if the Court finds them to be relevant, they are time-barred. In addition, the defendant agreed to the loss calculation in his plea hearing and therefore, his acceptance of the loss amounts is entitled to a presumption of verity. Tr. of Change of Plea Hr'g at 24-27; Blackledge at 97. Furthermore, the loss ranges presented to the Court at the plea hearing were anywhere from three million to seven million to seven and twenty million dollars for each count. Tr. of Change of Plea Hr'g at 24-27. This range is broad enough that even if some of the estimates are not perfect, they would not affect the potentially substantial loss amount for which the defendant is liable.

**The prosecution did not violate attorney-client privilege.**

The defendant provides no evidence regarding imagined violations of attorney-client privilege other than his own beliefs that the NSA and FBI might be watching him. Def.'s Mot. to Withdraw Guilty Plea at 44-45. The prosecution did not violate Mr. Rivernider's attorney-client privilege and this claim should be disregarded.

**The defendant was mentally capable of entering his guilty plea.**

The defendant's statements in his motion to withdraw his guilty plea directly contradict his statements at his plea hearing. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." Torres at 715. Additionally, his statements at the plea hearing are entitled to a presumption of verity. Blackledge at 97.

Sections 13(I) and 13(II) of the defendant's motion do not alleged any involuntariness or refer to the defendant's mental state. Section 13(III), however, is in direct contradiction to his statements at his plea hearing regarding his mental state,

> THE COURT: Mr. Rivernider, has anybody made any promises to you to cause you to cause you to want to change your plea?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Has anybody threatened you in any way to get your [sic] to change your plea?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Is anybody putting pressure on you to plead guilty?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Do you believe that changing your plea is in your best interest?
>
> THE DEFENDANT: I believe it's in my best interest and the best interest of everyone involved.
>
> . . . .
>
> THE COURT: Do you feel capable of making important decisions today?
>
> THE DEFENDANT: I believe that would be true.
>
> Tr. of Change of Plea Hr'g at 8, 16.

**Defendant's counsel was not ineffective.**

The defendant's statements in his motion to withdraw his guilty plea directly contradict his statements at his plea hearing regarding the efficacy of his counsel. "A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." Torres at 715. Additionally, his statements at the plea hearing are entitled to a presumption of verity. Blackledge at 97.

> THE COURT: Are you satisfied with the legal services that are being provided to you by your counsel?
>
> THE DEFENDANT: They've been wonderful.
>
> THE COURT: Do you have any dissatisfaction with their services whatsoever?
>
> THE DEFENDANT: None at all.
>
> THE COURT: Are you satisfied that your counsel have devoted enough time to this case to provide you with effective assistance?
>
> THE DEFENDANT: Yes, I am.
>
> THE COURT: Are you satisfied that they've spent enough time speaking with you about your options?
>
> THE DEFENDANT: Yes.
>
> Tr. of Change of Plea Hr'g at 8.

With respect to Mr. Bergenn and Mr. Chase, the defendant clearly registered his approval of their performance and that they provided him with effective assistance at his plea hearing. Therefore, Mr. Rivernider's claims of ineffective assistance of counsel against them should be disregarded.

With respect to Ms. Sadin, the defendant should be time-barred because he provides no justification for the excessive delay of almost 10 months between his plea hearing and filing this motion. Furthermore, he does not prove either prong required to demonstrate ineffective assistance of counsel with regards to any of his attorneys,

> [t]o allege a successful ineffective assistance of counsel claim a defendant must show that: (1) counsel's performance was unreasonably deficient under prevailing professional standards, and, (2) but for counsel's unprofessional errors, there exists a reasonable probability that the result would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2067, 80 L.Ed.2d 674 (1984).

Torres at 717.

Although the defendant gives an extensive list of complaints regarding counsels' performance, he does not demonstrate that they fell below professional standards or a reasonable probability existed that the result would be different. Therefore, his claim fails under Strickland and his guilty plea and indictment should be upheld.

For all the foregoing reasons, counsel request that this motion to withdraw to guilty plea and for dismissal of indictment be DENIED.

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ John H. Durham
JOHN H. DURHAM
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct05087
157 Church Street, 23rd Flr.
New Haven, CT 06510
Tel.: (203) 821-3700
Fax: (203) 773-5378

CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY
157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3700
Federal Bar No. CT14806

ALEXANDRA G. HESS
LAW STUDENT INTERN, UNITED STATES ATTORNEY
157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3700

CERTIFICATION

I hereby certify that on this date a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. A copy will be electronically mailed to Mr. Rivernider.

/s/ John H. Durham
John H. Durham

ASSISTANT U.S. ATTORNEY
Federal Bar No. ct05087
157 Church Street; 23rd Floor
New Haven, CT 06510
Tel.: (203) 821-3700