UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            No. 3:10-cr-222-RNC-1

        v.

ROBERT RIVERNIDER                   Hartford, Connecticut
                                    AUGUST 1, 2023
- - - - - - - - - - - - - - - - x


REVOCATION OF SUPERVISED RELEASE HEARING


B E F O R E:

    THE HONORABLE ROBERT N. CHATIGNY, SENIOR U.S.D.J.



A P P E A R A N C E S:


    FOR THE GOVERNMENT:

        UNITED STATES ATTORNEY'S OFFICE
        157 Church Street, 23rd Floor
        New Haven, CT  06510
        BY:  CHRISTOPHER W. SCHMEISSER, AUSA
            TRACY T. OPOKU, AUSA


    FOR THE DEFENDANT:

        FROST BUSSERT LLC
        350 Orange Street, Suite 100
        New Haven, CT  06511
        BY:  ROBERT M. FROST, JR., ESQUIRE


                   Alicia A. Cayode Kyles, RMR
                   Official Court Reporter

```
 1                    (The Court entered at 10:14 a.m.)
 2               MR. SCHMEISSER:  Good morning, Your Honor.
 3               MR. FROST:  Good morning, Your Honor.
 4               THE COURT:  Good morning.  This is a hearing on
 5     an amended violation report submitted by the Probation
 6     Office in the Rivernider case.
 7               We are conducting a hybrid proceeding today.
 8     I'm in open court with counsel.  Mr. Rivernider is
 9     appearing by Zoom.
10               Would counsel please enter their appearances at
11     this time.
12               MR. SCHMEISSER:  Good morning, Your Honor,
13     Christopher Schmeisser for the United States.  With me, at
14     counsel table, is Tracy Opoku of our office, who is both
15     much smarter than I am and also has the detailed
16     information that if the Court has any questions regarding
17     the FLU calculation of possible ability to pay.
18               THE COURT:  Thank you.
19               MS. OPOKU:  Good morning, Your Honor.
20               THE COURT:  Good morning.
21               MR. FROST:  Good morning, Your Honor.  Attorney
22     Robert Frost for Mr. Rivernider.
23               THE COURT:  Good morning.
24               Mr. Rivernider, are you able to hear everybody?
25               THE DEFENDANT:  Yes, sir.
```

```
 1              THE COURT:  Thank you.

 2              THE DEFENDANT:  Fine.

 3              THE COURT:  And also our Probation Officer is

 4   with us this morning.

 5              PROBATION DEPARTMENT:  Good morning, Your Honor.

 6   Kevin DelBiondo, U.S. Probation Office.

 7              THE COURT:  Good morning.

 8              The amended violation report has been docketed

 9   as ECF Number 821.  It was filed on June 6th.  Mr. Frost

10   submitted a memo in response to the report docketed as

11   ECF 823 filed on June 12.

12              Mr. Frost, even though I have your memo and I

13   have read your memo, procedure requires me to begin by

14   asking you a series of questions and so please bear with

15   me.

16              First of all, can you confirm that you did

17   indeed receive and read the amended violation report?

18              MR. FROST:  I've read it and reviewed it with

19   Mr. Rivernider, Your Honor.

20              THE COURT:  And are you satisfied, Mr. Frost,

21   that you've had enough time to go over it with

22   Mr. Rivernider?

23              MR. FROST:  Yes.

24              THE COURT:  Mr. Rivernider, addressing you

25   directly, can you confirm that you've received and read
```

1   the admitted -- the amended violation report ECF

2   Number 821?

3               MR. FROST:  Yes, I believe so, yes.

4               THE COURT:  And can you also confirm that you

5   have gone over it with Mr. Frost?

6               THE DEFENDANT:  Yes, we reviewed it.

7               THE COURT:  Are you satisfied that you've had

8   enough time to do that?

9               THE DEFENDANT:  Sure, yes.

10              THE COURT:  The report sets out three

11  specifications, that is to say three alleged violations.

12              The first charges a failure to pay restitution

13  as required by the judgment imposed as part of the

14  sentence.

15              The second charge alleges a violation of the

16  standard condition requiring a person on supervision to

17  follow the instructions of Probation Office.

18              And Charge 3 alleges a violation of a special

19  condition prohibiting Mr. Rivernider from incurring credit

20  card charges of more than $250 or opening additional lines

21  of credit or incurring other indebtedness without the

22  prior permission of Probation Office.

23              As the amended report explains these are

24  considered a Grade C violations, and for a Grade C

25  violation in Criminal History Category I, the revocation

1    table suggests a sentence of imprisonment of anywhere from

2    three to nine months.  In addition, as the report

3    explains, the Court has the authority to impose a

4    follow-on term of supervision of five years less any term

5    of imprisonment that is imposed.

6              Do you understand these provisions of the law,

7    Mr. Rivernider?

8              THE DEFENDANT:  I understand as you just read

9    them, yes.

10             THE COURT:  Very good.

11             Mr. Frost, how do you think we should proceed

12   today given what you have discussed with Mr. Rivernider?

13             MR. FROST:  Your Honor, the Court referenced the

14   memo that I filed back on June 12 of 2023.  That memo was

15   put together with input from Mr. Rivernider and he agreed

16   with the statements that were contained in the memo as his

17   response to the allegations.

18             We've discussed the three alleged violations

19   against him and I think Mr. Rivernider can correct me if

20   I'm misstating this, but essentially with respect to the

21   three violations, there's various conduct that's alleged,

22   obviously, that he admits, that that conduct occurred.

23   There's not any question, for example, that for those

24   months -- Violation Number 1, that from those months of

25   January of 2022 through October of 2022, he was not making

1    restitution payments during those months.

2          As I think our memo explains, there's a context

3    in which that conduct occurred, but the specific

4    allegation is that restitution was not paid on a monthly

5    basis during those months.

6          So that's, there's sort of, I guess what we will

7    call a factual admission by Mr. Rivernider, but with

8    context that we would submit explains it was not a willful

9    violation of the order, such that even if the Court were

10   to find a technical or knowing violation, that the Court

11   should consider that context in terms of what, if any,

12   further ruling the Court wishes to make on that condition.

13         Likewise, with respect to Condition Number 2, I

14   think as we set forth in the memo, Mr. Rivernider agreed

15   with this.  The Probation Officer asked him to resume

16   paying, and this was after the Court ruled on the

17   outstanding 2255.  That the decision came down in

18   September of '22.  There was a meeting held with

19   Probation, either that month or the following month.  I

20   think it was in October.  And Probation asked

21   Mr. Rivernider to resume paying at the $150 a month that

22   they had requested he start paying a year earlier when he

23   had said he wanted the issue to come back before the court

24   for consideration.  Given that he believed that the

25   opportunity to have his ability to pay heard by the court,

1    he indicated he would not pay the $150 month, but he

2    resumed in November paying the $25 a month that has been

3    what he was paying up until January of 2022.

4            So, again, an instruction from Probation, the

5    condition is that you have to follow instructions from

6    Probation, there's an acknowledgment from Mr. Rivernider

7    that he didn't follow the Probation Officer's directive,

8    but that he believed that the issue was something that

9    needed to be addressed by the Court.

10            And so, therefore, within that context, again,

11    knowingly not following the Probation Officer's order, but

12    in his mind not willful in terms of trying to avoid the

13    issue entirely.  He thought there would be an opportunity

14    which, in part, is sort of been fulfilled through this

15    process to address his ability to pay.

16            And that brings us to condition number or

17    Violation Number 3, very similar situation where the

18    written judgment issued by the Court required that he not

19    any incur any additional new charges of $250 or more or

20    open any lines of credit without prior permission of

21    Probation.

22            There's no question and I think Mr. Rivernider

23    acknowledged that to the Probation Officer, that he did

24    open up a number of credit cards, mostly with small

25    charges and, therefore, again, a technical violation of

1    that condition as written in the order.  Mr. Rivernider's

2    you know, he did open -- he admits that he opened those

3    credit cards and then promptly closed them when Probation

4    asked him to.

5            Again, his explanation, which is set forth in

6    our memo is that, and he's correct, that the Court's oral

7    pronouncement at sentencing was slightly different than

8    the written judgment and he interpreted it as not

9    incurring any new charges of $250 or more.  And once it

10   was brought to his attention that he needed permission of

11   Probation, he complied.

12           So, again, there, obviously, he intended to open

13   the credit card accounts.  That's a technical violation of

14   that written condition, but within the context that I just

15   provided, not a willful violation by him.

16           I think that would be -- so I don't know how the

17   Court wishes to proceed.  I've just explained it to

18   Mr. Rivernider that obviously this is a supervised release

19   violation proceeding, there are sort of two options, an

20   explain or a deny and have a hearing.

21           I think what we're saying is we admit the

22   conduct, but we want to get to the next part of it which

23   is to put it in context and explain why it was not a

24   willful -- these weren't willful violations by

25   Mr. Rivernider.  And assuming we get past that point, as I

1    think I stated in the memo, my -- I feel like the main

2    issue, I hope, should not be putting Mr. Rivernider back

3    in jail for some technical violation but to address the

4    core issue, which seems to being his ability, what is his

5    financial ability to pay restitution.  And that came up

6    when we were before the Court in February and there was an

7    adjustment made and I think the issue is sort of framed by

8    the submissions of the parties is does he have the ability

9    to pay more than the $125 that the Court ordered back in

10   February and we can address that at that point.

11           But, obviously in the first instance, you know,

12   while we would acknowledge and I think Mr. Rivernider

13   would acknowledge that he can admit the conduct.  I think

14   he has an explanation, which we've submitted in the memo,

15   that he thinks explains that it was not willful on his

16   part.

17           And I hope I've summarized accurately for

18   Mr. Rivernider.  I think he'll correct me if I didn't.

19           THE COURT:  All right.  Thank you.

20           Mr. Rivernider, did you hear what Mr. Frost

21   said?

22           THE DEFENDANT:  I did, yes.

23           THE COURT:  Do you agree with what he said?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Mr. Schmeisser, do you have any

1    comments at this point?

2         MR. SCHMEISSER:  Yes, Your Honor.  In terms of

3    sort of cutting to the chase and what the Government's

4    approach would be here, is that I think that the defense

5    has admitted enough, certainly on 1 and 3 of a

6    technical -- a knowing violation.  I think, in fact, the

7    defense for the Number 3 was that the Court's oral

8    admonition at sentencing that new credit charges above

9    $250 without the prior permission of Probation Office, and

10   actually looking at the list of credit cards that were

11   actually opened by Mr. Rivernider, there appear to be a

12   balance, at least on the Apple Card of $642, so that would

13   actually have even exceeded the oral requirement at

14   sentencing.

15        But in some ways I -- however the Court wants to

16   do it.  It would be the Government's position that we're,

17   the Government, at this time is not seeking to

18   re-incarcerate Mr. Rivernider.  I think that the -- a good

19   use of the time today would be to determine what is an

20   appropriate payment plan going forward for the defendant

21   on a monthly basis and then make sure that everyone

22   understands that.

23        Of course, if the Court has a different

24   perspective on this, the Government fully understands

25   that; but from the Government's perspective, there'd be a

1    sufficient basis for one or more technical and, in fact,

2    as to the Number 3, definite violations of the actual

3    conditions of supervised release.  But, regardless of it,

4    there's a fine and the Government would recommend that the

5    defendant not be re-incarcerated at this point, but

6    actually move on to actually a hearing on what is the

7    appropriate payment plan going forward.

8              THE COURT:  All right.  Thank you.

9              Mr. DelBiondo, do you have any comments at this

10   point?

11             PROBATION DEPARTMENT:  Your Honor, Probation

12   doesn't have anything else to add.  I think the core of

13   today's hearing is determining what he can pay moving

14   forward.

15             THE COURT:  All right.  Thank you all.

16             At this time I'm going to ask the Clerk to place

17   Mr. Rivernider under oath.

18             Mr. Rivernider, please stand and be placed under

19   oath.

20             (The defendant was sworn.)

21             THE CLERK:  Please state your name for record.

22             THE DEFENDANT:  Robert Henry Rivernider, live

23   person.

24             THE COURT:  Thank you.

25             Mr. Rivernider, I asked the Clerk to place you

1    under oath because I need to ask you some questions

2    concerning these alleged violations following up on

3    Mr. Frost's summary just now.

4            My intention is to make it clear on the record

5    what your position is with respect to the facts of these

6    alleged violations so that we can proceed from there.

7            I will tell you, Mr. Rivernider, that at the

8    moment I, myself, have no objection to taking the steps

9    that counsel have suggested.  That is, I'm happy to focus

10   our attention today on the amount that you should be

11   paying as required by law, taking in account of your

12   income and necessary expenses.

13           But before we turn to that, let me first ask

14   you, do you admit the facts set out in Charge Number 1 of

15   the amended violation report, specifically that you did

16   not submit restitution payments for the months

17   January 2022 through October 2022?

18           THE DEFENDANT:  I admit that I personally did

19   not submit payments.  However, over $1200 was submitted to

20   the Government on behalf of me, as the President and

21   Congress determined that money was to go to me the

22   Government apparently chose unilaterally to decide that

23   that would not be credited towards money that I would --

24   that I was supposed to be paying.

25           THE COURT:  All right.  With regard to Charge

1    Number 2, do you admit that you failed to follow the

2    instruction of the Probation Officer in the Middle

3    District of Florida, that you resume paying restitution

4    following your meeting with that officer on

5    October 7, 2022?

6              THE DEFENDANT:  The only request was that I

7    resume paying.  I did resume paying.  The only agreement

8    that we had at that time was to pay the $25 a month and I

9    resumed paying the $25 a month.

10             THE COURT:  According to the amended report, you

11    stated to the Probation Officer at that time that you

12    would continue to submit $25 a month, but the officer

13    reiterated that your financial condition required you to

14    pay more, specifically $500 per month as ordered.

15             THE DEFENDANT:  That was --

16             THE COURT:  And you subsequently said that you

17    would not pay more than $25 per month until quote,

18    unquote, the judge explained himself, end quote.

19             THE DEFENDANT:  I don't use that kind of

20    language.

21             I'm sorry.

22             THE COURT:  You don't agree with that statement

23    of what occurred?

24             THE DEFENDANT:  I disagree with those words that

25    I say I would like to go back to the Court to get an

 1  explanation as to why some of the restitution order would

 2  go to a company like Selene Finance, who as -- I don't

 3  know if the Court read my information that I've been

 4  submitting for the past year or several years, but you

 5  have a company that flipped the property, made $21,000 and

 6  I'm required to pay them 285,000.  I don't understand why

 7  that's the case.  I think that was just -- there's two

 8  companies like that.  That increased the sentencing.  So I

 9  did want an explanation as to why I would have to pay

10  Selene Finance $285,000 who was not a victim and who made

11  21,000.  My understanding of the law is that's not

12  permitted.

13          THE COURT:  I think it bears noting,

14  Mr. Riverinder, that regardless of whatever concerns you

15  may have with regard to Selene Finance, the restitution

16  order entered as part of the sentence in the case requires

17  you to pay a total amount of over $22 million jointly and

18  severally with your co-defendants.  And because of your

19  inability to pay that amount pursuant to the applicable

20  statute, you were ordered to pay $500 a month throughout

21  the five-year term of your supervised release.  A total of

22  $30,000, which would amount to .13 percent of your total

23  restitution obligation.

24          In that context I think it's fair and reasonable

25  for me to regard your concern about Selene Finance as

1  misplaced.  We're talking about your ability to make

2  monthly payments while on supervision that, if made, would

3  total 1.3 percent -- I'm sorry, .13 percent of your total

4  restitution obligation.

5          I would ask you to bear that in mind.

6          Turning from there to the third charge, you

7  admit opening the credit card accounts enumerated there,

8  is that right?

9          THE DEFENDANT:  Yes.  My understanding, based on

10  the sentencing, that I not in charge -- incur charges.  I

11  assumed that was a single charge of more than $250 without

12  getting approval.  That's the way I understood it.

13          Now, opening a credit card, a Wawa card or

14  whatever to get gas and different things that I needed to

15  operate on a daily basis and to build credit so that I can

16  find a place to live was necessary.  So I didn't see -- I

17  didn't look at the written report when I applied for a

18  credit card.  I just remembered not being able to charge

19  over $250.

20          THE COURT:  The amended report states that as of

21  March 28, 2021 you had an Apple card with a balance of

22  $642.

23          Do you admit that?

24          THE DEFENDANT:  They've all been paid and that

25  was a, throughout the month, charges that was throughout

1    the month and that was paid off monthly.  There was no

2    balance carried.

3              THE COURT:  All right.  Based on

4    Mr. Rivernider's statements just now, which I accept in

5    the context of his previous agreement with Mr. Frost's

6    summary, I find by a preponderance that Mr. Rivernider has

7    violated the conditions as alleged in Charges 1 through 3

8    and I propose to reserve the question whether a sanction

9    for these violations is warranted pending further

10   discussion.

11             That having been accomplished, let me turn to

12   the matter that counsel want to address going forward,

13   Mr. Rivernider's ability to pay restitution.

14             The Government has submitted a petition in

15   support of modification of the payment schedule asking

16   that Mr. Rivernider be ordered to pay restitution at the

17   rate of $500 per month as contemplated by the original

18   sentence.

19             Mr. Frost, have you received and read the

20   petition dated June 12th?

21             MR. FROST:  I did, and just to place on the

22   record that prior to the Government submitting that, I had

23   been in contact both with Mr. Schmeisser and Ms. Opoku

24   about the Government's conclusions after doing their

25   investigation and what they intended to submit.  It sort

1    of ended up that we almost submitted almost simultaneous

2    filings, but my filing was intended to address,

3    essentially was a draft that Ms. Opoku shared with me of

4    the Government's position.  So the brief that I filed on

5    June 12th, that the Court has, that's why it essentially

6    responds to that petition.

7           And Mr. Rivernider has had an opportunity to

8    review the Government's petition as well and discuss that

9    with me several occasions prior to today.

10           THE COURT:  All right.  Thank you.

11           Mr. Schmeisser.

12           MR. SCHMEISSER:  And, Your Honor, just to

13   clarify the Government's position on this, in seeing the

14   original -- the violation report and the original dollar

15   amount that was requested or ordered for restitution, the

16   FLU Unit went back and looked at Mr. Rivernider's finances

17   and the memoranda is intended to explain the Government's

18   reasoning why a $500 might be appropriate in this case.

19           This is a situation where the Court has

20   substantially more experience in determining what are

21   appropriate restitution amounts given the range of the

22   defendants that the Court sees on a routine basis and so

23   the Government ultimately defers to the Court and the

24   judgment of the Probation Office and defense counsel's

25   recitation of the facts as to what is an appropriate

1    amount on a monthly basis going forward.

2             MR. FROST:  Your Honor, just so the record is

3    clear, so it'd be our position that we don't seek nor

4    request an opportunity.  I didn't file anything in

5    response to the Government's petition, nor are we

6    requesting that opportunity.  I would request that the

7    Court treat my memo on June 12th as essentially our

8    position in response to the arguments set forth in the

9    Government's petition.

10            THE COURT:  To be clear, Mr. Frost, it's

11   Mr. Rivernider's position that the most he can reasonably

12   be expected to pay going forward is $125 a month?

13            MR. FROST:  That's his position, Your Honor.

14            I think our request was and that's -- he's

15   actually paid a little bit more than that as I noted on

16   the memo for a couple of months, again, under the

17   misimpression that the Court had ordered that back in

18   February.

19            The Court's order was, as set forth in its

20   written order was $125 a month and Mr. Rivernider, to be

21   sure that he met whatever the Court required, paid the

22   $150 a month.  Most recently he paid the 125 that was

23   ordered by the Court.

24            I think the concern is that in order to -- he

25   feels that that, given his cash flow and his sort of

1    monthly budget, that he believes that that's a reasonable

2    and very feasible number for him.  If the Court increases

3    it, the concern is that certainly, over a period of

4    months, that is going to affect his cash flow, and it may

5    well be that we're back here on some sort of motion to

6    modify in light of some financial circumstance.

7         The example that came up just on the very day

8    that I was filing our memo was a substantial car repair

9    for a car that's a very old car with hundreds of thousands

10   of miles on it, but that cost Mr. Rivernider, I think it

11   was over $1200 to repair, and he needs that vehicle.

12        And so from time to time there are expenses that

13   come up like that.  He also has the obligations that we,

14   both the Government and Defense, have discussed in their

15   submissions.  And so his position is that keeping it at

16   the 125 per month is something he's demonstrated he can

17   meet and he's reluctant to suggest any higher number given

18   his current situation.

19        THE COURT:  Mr. Schmeisser, I appreciate your

20   confidence in my ability to determine an appropriate sum,

21   but I must admit that in actual fact I don't have much

22   experience in this area.  Indeed, I don't think I've had

23   this situation before.

24        Normally you set the amount as best you can, and

25   then life goes on.  And I may be mistaken, but I cannot

1   remember having a hearing on a modification.  When

2   problems arise, as they do, the individual seems able to

3   work it out with Probation Officer and there's no need for

4   a hearing.  Sometimes you'll get an agreed upon

5   modification, but even that doesn't happen very often.

6           So -- just so there's no misunderstanding.

7           Based on the Government's petition, it appears

8   to me that we have a disagreement between the parties with

9   regard to whether Mr. Rivernider should be able to base

10  the amount of his monthly restitution payment on his

11  desire to provide financial support to his son.

12          As the petition states at Page 6, much of the

13  monthly expense amount of a little over $2,000 encompasses

14  child support that Mr. Rivernider was ordered to pay for

15  his two children until they reach the age of majority.

16          Mr. Rivernider is claiming $700 as an amount

17  that he must pay and the Government believes that he is

18  actually obliged to pay about half that amount, so that

19  would be $350.  And if you add that to the, let's say $150

20  that Mr. Rivernider appears able to pay, you get to the

21  $500 figure that the Probation Office has recommended.

22          Why shouldn't I go along with the $500 in light

23  of that point?

24          MR. FROST:  I think, if we were to go in that

25  direction, that suggests that maybe for one month or two

1    months, you know, will he be able to make that $500 month

2    payment perhaps.  But it would mean, as I think we

3    explained, Mr. Rivernider, not having any additional

4    income to use to help out his son, who's still in college.

5    You know, the manner in which he does that is typically

6    through purchases to help out his son or cash when his son

7    needs money at school.  Things that I think many parents

8    do when they have kids in college and those -- and even

9    when the kids are working they need extra money.

10          He has a sense of moral obligation to do that,

11   certainly as a parent, but I think based on his being away

12   for so long and not be being able to make those payments

13   when they were court ordered when there wouldn't be this

14   dispute, because the court ordered $700 a month.  Now he

15   feels that it's appropriate for him to do that.

16          If the Court were to look at his entire

17   financial situation and that amount that he likes to

18   utilize to help his son and say that should go to

19   restitution, the Court could do that.  My concern is that,

20   and I sort of take a bigger step back and say that if you

21   do that, then the situation financially gets tighter and

22   then as you get maybe two, three months down the road,

23   $500 a month, that's going to be $1500 a month over that

24   period of time and what will his situation look like then?

25          And as I think we sort of said more broadly, his

1    month to month can be somewhat changing from month to

2    month because of the commission-based aspects of his

3    employment.  He has good months and he has lean months.

4            And so what we would want to avoid is a

5    situation where three months down the road he has a lean

6    several couple of months, he does, not withstanding the

7    Court's order, try to use some money to help his son and

8    he makes those $500 a month as ordered and now we're back

9    in front of the Court on some sort of request by

10   Mr. Rivernider to get some relief, to try to calibrate

11   between the 150 and 500.

12           I think, as the Court just pointed out, there's

13   obviously a track record here that he can pay more than

14   125 a month.  I think Mr. Rivernider's position is it

15   should just stay what you ordered in February, but he

16   obviously made those 150 payments for several months and

17   was able to do so; but I would be hesitant and I think

18   Mr. Rivernider, it would be his request that the Court not

19   immediately jump to $500 a month based on that simple

20   analysis that, well, he shouldn't be giving $350 in any

21   way, shape or form to his son, that should go to

22   restitution and there's your $500 a month.

23           THE COURT:  All right.  The applicable statute,

24   that is the statute that governs setting a payment

25   schedule, 18 United States Code Section 3664 F-as-in-Frank

1  (2) provides that in setting a payment schedule, the Court

2  must consider the individual's financial resources and

3  other assets, the individual's projected earnings and

4  other income, and any financial obligations of the

5  individual including obligations to dependents.

6          As I look at those factors, based on what has

7  been presented to me, it appears that Mr. Rivernider has

8  no financial resources other than his earnings.

9          Am I correct or am I mistaken about that?

10          MR. FROST:  His only employment is the

11  employment that generates his wages.  He has no other jobs

12  that he's currently working.

13          THE COURT:  And with regard to projected

14  earnings, Footnote 13 of the Government's petition states

15  that, quote, Rivernider's paystub reflects yearly

16  nonemployee compensation of approximately $45,000 in 2021

17  and $51,000 in 2022, which provides a monthly gross income

18  of most recently $4,260.

19          Should I consider that information in

20  determining Mr. Rivernider's projected income?

21          MR. FROST:  So those are his earnings.  I think

22  the one thing I asked the Government about this and we

23  haven't revisited it prior to the hearing, but those are

24  gross numbers, so it doesn't account for taxes and I don't

25  have that figure as to what the net would be on those two

1    years.  The analysis that was done was based on gross

2    earnings.  You know, we don't dispute that those are the

3    numbers, I guess is what I'll say, but it doesn't account

4    for taxes which he does have to pay.  And because he's a

5    1099 employee, you know, he pays those taxes.

6              But those are his earnings.

7              THE COURT:  So, it would be fair and reasonable

8    for me to determine the question of Mr. Rivernider's

9    projected earnings in light of that information and assume

10   that although as a commission person, you know, some

11   months are better than others.

12             MR. FROST:  Right.

13             THE COURT:  Annualized, his gross income is

14   likely to be in the neighborhood of $50,000?

15             MR. FROST:  I'd say between 45 and $50,000 I

16   think is fair, and I think you're right, counting for the

17   fact some of that has to be paid for taxes and there's

18   some fluctuation month to month, which creates tension

19   month to month to pay restitution, but I think that's fair

20   to say that his income is in that range.

21             THE COURT:  Because these three statutory

22   factors need to be considered, is there anything that you

23   would like to say about any of them beyond what you've

24   already said, Mr. Frost?

25             MR. FROST:  I don't think so, although I hadn't

1   focused on it until the Court focused us on that section

2   of the statute, but the statute doesn't seem to make any

3   differentiation between, it says "supporting dependents".

4   I understand that may be a term of art that means, you

5   know, if the dependent is not living with you then it has

6   to be court ordered or something along those lines, but he

7   certainly still has two children that he's trying to

8   support in a way that he can.  And so I think it does fit

9   within that plain language of that section of the statute,

10  so I would add that to my argument that's submitted in the

11  memo that we submitted to the Court.

12          THE COURT:  Any comments, Mr. Schmeisser, with

13  regard to the statutory factors including the proper

14  interpretation of the third factor, any financial

15  obligations of the defendant including obligations to

16  dependents?

17          MR. SCHMEISSER:  No, Your Honor.  I think that

18  really given the defendant's income level what we're

19  trying to determine is what he realistically can pay so we

20  don't end up here next month with a car bill or whatever

21  and trying to make a reasonable assessment going forward.

22  If the defendant is projected, at least for the next

23  several years, to have an earning rate of 45,000 a year

24  gross, then that gives some important information and then

25  the Government has no other observations either way other

1    than that we're trying to avoid being back here next

2    month.

3                THE COURT:  Mr. Frost, can you give me an

4    estimate of what Mr. Rivernider's net income is likely to

5    be after taxes?

6                MR. FROST:  I would probably defer to

7    Mr. Rivernider.  I don't have that number.  Again, I think

8    this -- at one point, I think prior to what was the June

9    hearing I think I was looking into that and didn't revisit

10    before today other than to note that that figure that is

11    in the Government's papers is a gross figure.

12                I don't know whether Mr. Rivernider has that

13    figure handy, but he would be the one that would know.  I

14    could confer with him or if he has that number handy, I

15    would not have any problem with him sharing it with the

16    Court.

17                THE COURT:  Do you know your net annual income,

18    Mr. Rivernider, after taxes?

19                THE DEFENDANT:  Well, I think the Government was

20    using a number of $2,963 a month.  That's probably right

21    about right when you take out the expenses that are

22    required.  I have to put gas in the car.  I have to change

23    the oil every so often.  And there's a credit card fee and

24    whatnot that my job requires that I pay.  So it's a lot of

25    things that I pay.

1          Coming October I will be going back on to the

2    Obamacare health insurance program, which is going to cost

3    me several hundred dollars more because the insurance that

4    I have now that they're calculating covers nothing, so had

5    me going to the doctor, which, as you know, is a problem

6    for me.  So come October I will be going back onto more

7    expensive insurance, which is going to be -- last year it

8    was $285 a month.  I expect this year it may be a little

9    bit more, so we can be back here in October discussing

10   that.

11          My car --

12          MR. FROST:  Mr. Rivernider, Bob, let me just, if

13   I can interrupt.

14          Just the focus at the moment is on your tax

15   obligation.  Do you know, approximately, how much the

16   government is being paid from your annual wages in taxes?

17   Do you have that figure handy?  If you don't, that's fine.

18          THE DEFENDANT:  Last year was about $4,000 in

19   taxes.

20          THE COURT:  Does that make sense?

21          MR. SCHMEISSER:  Well, Your Honor, just doing

22   the back of the napkin, it looks like up to about $45,000

23   he is looking at 12 percent marginal rate, and then on top

24   of that I don't know if he has 1099 FICA due to those

25   types of payments into social security and otherwise, so

1   it may be something in excess of that, but somewhere in

2   that ballpark 5, 6, $7,000, just back of the napkin.

3           I mean, Your Honor, just in terms of the Court's

4   assessment and sort of the ability to pay, there --

5   defense counsel has submitted at least a rough estimate of

6   living expenses.  Obviously those are something the Court

7   would take into consideration to try to figure out what a

8   net number might look like.  So I just put that before the

9   Court.

10          PROBATION DEPARTMENT:  Your Honor, may I?

11          THE COURT:  Yes.

12          PROBATION DEPARTMENT:  A little bit dated

13  information that's included in the violation report is

14  that in March 2021 his monthly average net income was

15  approximately $2700 per month.  If you multiply that by

16  12 months, it's about $32,000 a year.

17          THE COURT:  All right.  At Page 7 of the

18  Government's petition, the Government states that through

19  its asset investigation, it is confirmed that

20  Mr. Rivernider regularly spends thousands of dollars on

21  discretionary expenses including fine dining and the

22  Government cites Exhibit B, which is ECF 827 containing

23  records from Citizens First Bank.

24          Mr. Frost, have you had an opportunity to review

25  those records?

1              MR. FROST:  Yes, Your Honor.

2              THE COURT:  Are you at all concerned that the

3    Government's statement is borne out by those records?

4              MR. FROST:  I'm not sure how the Government is

5    utilizing the thousands of dollars.  It may be a total

6    aggregate sum of everything.  There are, certainly, a

7    number of charges related to meals out.  I don't see them,

8    any one, as I was skimming those bank statements again for

9    this morning's proceeding.  I don't see any that seem to

10   be terribly outsized.

11             As I recall, there may have been one charge that

12   was a focus of Probation Office at one time and I believe

13   Mr. Rivernider explained that there was a business-related

14   dinner that he had tried to organize.  It was at a

15   restaurant and it tended to be a larger charge, but I

16   don't recall that there were any single charges that

17   seemed to sort of jump out at you as you started to go

18   through the bank statements; but he does, I mean, there's

19   no question that he does eat out.

20             I think that was -- I think a concern that was

21   raised by somebody at some point that, you know, somebody

22   made the observation should he pack a lunch, you know,

23   rather than eating out -- maybe just six in one, half a

24   dozen in the other.  You got to go to the grocery store

25   and buy that food to make that sandwich, so food costs are

1    food costs depending on where you're eating.

2              I mean, if you're going to a 5-star restaurant

3    that's different than, you know, a quick lunch while

4    you're out on the road.

5              I mean, I would point out Mr. Rivernider is out

6    on the road a lot for his job, which is why the car

7    expense was such a significant point for him.  He is a

8    commissioned worker and he is making sales calls and out

9    on the road quite a bit so there are charges related to

10   that.

11             But I -- you know, I think the Government was

12   probably aggregating over the course of time covered by

13   those bank statements, that when you add it all up there's

14   a lot of dining charges.

15             That was the way I read it.

16             THE COURT:  Mr. Schmeisser, do you want to

17   comment on that aspect of the matter?

18             MR. SCHMEISSER:  Your Honor, I don't want the

19   Government to be sort of pigeonholed with a

20   characterization that the Court has the, sort of the

21   banking records and sees what are taken out in withdrawals

22   and payments and make an assessment whether or not these

23   are understandable expenses.

24             Again, we're sort of at the margin here as to

25   exactly how much is appropriate and, you know, again,

1   trying to take into consideration the one-time expenses

2   that may come up.  So I think the Court has the bank

3   records there and may get a sense of what the expenditures

4   are.

5         (Pause)

6         THE COURT:  All right.  Mr. Rivernider, I'll

7   give you an opportunity to comment before I make a finding

8   about how much you're able to reasonably pay in

9   restitution going forward.

10         Is there anything you want to add?

11         THE DEFENDANT:  Yes, Your Honor.  I will just

12   add I would like to say that the expenses are a direct

13   reflection of my job.  If I don't go to those places where

14   people are that I generate business from, which has a cost

15   to it, I don't generate that business, which then has less

16   income.  So we'll be back here talking about my $1500 a

17   month income if I don't have those expenses.

18         THE COURT:  I see.  So, for instance, when on

19   October 24 of 2022 you dined at Wolfgang Puck of the

20   Villages, that was a business expense?

21         THE DEFENDANT:  Yes, sir.  Wolfgang Puck is a

22   local restaurant here and I had a business meeting there.

23         THE COURT:  Do you deduct that as a business

24   expense?

25         THE DEFENDANT:  To the extent that it's

1  deductible, only a portion of it is deductible.

2          THE COURT:  Well, I think that's a fact that

3  bears on what Mr. Rivernider should be expected to pay.

4  Yet, looking at the bank records, but for Mr. Rivernider's

5  explanation that these are business meetings, the expenses

6  would, I think, require me to find that Mr. Rivernider

7  should be paying more each month along the lines of the

8  $500 suggested by the Government.

9          In October of last year when Mr. Rivernider

10  wasn't paying anything he incurred charges for dining out

11  at Wolfgang Puck and the Outback Steakhouse of about $300.

12  I'm looking at entries for October 24 and October 26.

13          And then in --

14          THE DEFENDANT:  Those people joined the program.

15  Those people joined the program and so I made a commission

16  off of that and so it was well worth it.

17          THE COURT:  And then on November 14, again, we

18  see Wolfgang Puck and Outback totaling about a $100.

19          And then on 11/21 a Japanese steakhouse charge

20  of $56.

21          On November 25, a restaurant charge of $50.

22          Going into December, on December 9, Wolfgang

23  Puck $100.

24          Other restaurants on December 12, another $80.

25          I mean, to the extent that these expenses are

1    reasonable business expenses incurred by Mr. Rivernider in

2    order to earn the commission I think that it's important

3    to bear that in mind.

4          The Government also mentions unexplained cash

5    withdrawals and indeed the records show that

6    Mr. Rivernider frequently withdraws what are, in my mind,

7    fairly -- can be viewed as significant sums, like $400 at

8    a time; $480.

9          Can you tell me why I shouldn't treat those cash

10   withdrawals as evidence of your ability to pay more per

11   month, Mr. Rivernider?

12         THE DEFENDANT:  That's how I take care of my

13   kids.  My son's studying to be a public school teacher and

14   I'm going to help him any way I can -- still in college.

15         THE COURT:  All right.  Thank you.

16         Based on the information available to me today I

17   think that Mr. Rivernider reasonably can be expected to

18   pay $400 a month.

19         As I interpret the statute, he is not entitled

20   to claim, if you will, the expenses of helping his son.

21   The statute, as I interpret it, refers to legal

22   obligations to dependents and Mr. Rivernider has not shown

23   that he has such an obligation with regard to his son.

24         While I fully understand and appreciate

25   Mr. Rivernider's desire to be helpful to his son, the law

1  makes a priority, as I interpret the statute, of his

2  restitution obligation to his victims and that obligation

3  arises as a part of the original sentence for the harm

4  done to not just the banks but also to the individuals.

5          And on that note, let me ask for clarification

6  from the Government, when Mr. Rivernider submits a

7  payment, who winds up getting that money?

8          MS. OPOKU:  That would be the Clerk's Office,

9  Your Honor.

10         THE COURT:  And do we know how that money is

11 allocated to victims?  In other words, do we know whether

12 the individuals who were defrauded as part of the "No More

13 Bills" scheme receive the money prior to any banking

14 institution or whether it's allocated pro rata to each and

15 every one of the victims regardless of whether it's an

16 individual or a banking institution?

17         MS. OPOKU:  As far as I'm aware, Your Honor, it

18 is pro rata to all of the victims regardless of who they

19 are.

20         THE COURT:  I believe, under the statute, the

21 Court has authority to direct payment to certain victims

22 and it may be that in a case like this one, that's

23 authority that is properly exercised, especially in view

24 of Mr. Rivernider's objection that the financial

25 institutions are not victims.  An objection that I don't

 1   find to have merit, but I don't think that Mr. Rivernider

 2   has the same take, if you will, on his obligations to the

 3   individuals, although he does accuse them of usurious

 4   practices.

 5        By the way, Mr. Rivernider, I'm just curious,

 6   who set the interest rate, so to speak, for the

 7   individuals in the "No More Bills" payment?  Was it them

 8   or was it you?

 9        THE DEFENDANT:  It was the amount of money they

10   wanted to receive, which made it a usurious amount, which

11   under Connecticut law is illegal to attempt to collect.

12        MR. SCHMEISSER:  Your Honor, I don't think at

13   this point it's productive to go down the road of the

14   underlying conduct here, and given the actual dollar

15   amounts that are being involved here, I think that this

16   Probation's indicated when -- if there was a $25 a month

17   payment it -- just even covering the cost of distribution

18   of the moneys was not worth it to anybody.

19        So at this point I would request the Government

20   -- the Court just continue the current restitution order

21   and determine appropriate payment schedule.  We're not

22   looking, in this situation, with Mr. Rivernider repaying

23   thousands or even hundreds of thou- -- I mean hundreds of

24   thousands of dollars.

25        So in terms of the actual marginal benefit, the

1    Government would submit that maintaining the current order

2    in its current form is the best approach going forward at

3    this point.

4         THE COURT:  Okay.  All right.

5         I find that Mr. Rivernider can reasonably be

6    expected to pay $400 a month in restitution going forward.

7    I reach that determination having considered the

8    information available to me in light of the statutory

9    factors in 18 U.S. Code 3664(f)(2).

10        I have found that Mr. Rivernider has violated

11   the conditions of his supervision as set out in the

12   amended report and I have deferred action on any sanction.

13        At this point, Mr. Rivernider, I want to take

14   just a few minutes to explain my view of the matter so

15   that there is, hopefully, no misunderstanding going

16   forward.

17        In my view, you have been properly ordered to

18   pay restitution as part of your sentence.  The order is a

19   legal obligation that you're bound to follow.  Under the

20   law, willful failure to pay restitution is grounds for

21   revoking a term of supervised release and imposing a

22   sentence of imprisonment.  Under the guidelines, as you

23   know, the recommended sentence is 3 to 9 months.  In

24   deciding whether a failure to pay is willful, the Court

25   considers the individual's ability to pay and also the

1    individual's attitude toward payment.

2            In a number of cases the Court of Appeals has

3    upheld District Court decisions revoking supervision and

4    imposing imprisonment as a sanction for a failure to pay

5    restitution when there was no indication that the

6    individual's failure to pay was other than willful.

7            In this case, it is difficult to avoid the

8    conclusion that you will do what you can to avoid paying

9    restitution, whether you're able to pay it or not, because

10   you stubbornly insist that you have been a victim of an

11   injustice.

12           You can think that if you wish.  You're welcome

13   to think that if you wish, but bear in mind,

14   Mr. Rivernider, it's a factor for me to consider in

15   deciding whether a failure to pay is willful.

16           I want you to understand, Mr. Rivernider, that

17   although you feel free to make statements that defendants

18   typically don't make, statements that, on their face, you

19   know, appear to be mocking the Court, mocking the process,

20   you don't have a right to evade your restitution

21   obligation because you think it's wrong.

22           The restitution obligation is required by law.

23   The statute requires that the Court order restitution.

24   The only discretion the Court has is in setting the

25   monthly payment schedule.  And in this instance, as in

1    other instances, I believe that the orders of the Court

2    have been measured, fair, reasonable, and not

3    appropriately the subject of your mockery.

4           I will bear that in mind if I am called upon to

5    determine whether a future failure to pay is willful.  I

6    specifically warn you, Mr. Rivernider, that if I find that

7    you have willfully failed to pay restitution, I will not

8    hesitate to revoke your supervised release and incarcerate

9    you.

10          Please be warned, and if you have any questions

11   about my legal authority in that regard Mr. Frost remains

12   available to you.

13          I could digress and take further time to talk

14   about why I believe your view is ill founded, but I won't.

15   I just want to be clear today, so that if you are back

16   before me in the future you can't claim not to have

17   understood the law.  You won't be in a position to argue

18   you didn't realize that you were putting yourself in

19   jeopardy by failing to pay restitution in circumstances

20   making it appear that you could have done so but simply

21   chose not to because of your contempt for the process and

22   the restitution order.  I hope that's clear to you.

23          THE DEFENDANT:  Crystal clear, Your Honor.  I

24   understand the law, thank you.  And, but I also understand

25   that fraud before the court vitiates everything that

1    happened, so --

2              THE COURT:  As I read -- you know, as I read

3    your motion, I couldn't help thinking to myself,

4    Mr. Rivernider -- I'm referring now to your motion to be

5    referred to going forward to as Hunter Biden, a motion

6    which I'm denying as frivolous.

7              The reference you make to fraud vitiating

8    everything it touches is particularly ironic given that

9    you, alone, among the people in this courtroom stand

10   convicted of fraud and many counts of fraud based on your

11   own guilty pleas.

12             If fraud vitiates everything it touches,

13   Mr. Rivernider, perhaps it's time for you to take a

14   longer, closer look in the mirror.

15             In any event, as I said to Mr. Schmeisser

16   before, I don't intend to spend a lot of time, you know,

17   nitpicking your expenses and your income.  It's not

18   something that you can reasonably expect I don't believe.

19   Under the order, your ability to pay is to be determined

20   in the first instance by the Probation Office subject to

21   approval by the Court.  I'm not delegating my authority to

22   the Probation Office.  I'm availing myself of the

23   assistance of Probation Office in determining how much you

24   can pay.

25             So let's say that the $400 I'm requiring you to

1    pay turns out to be beyond your ability to pay because you

2    have incurred unnecessary auto repair expense, for

3    example.  You need to discuss that with your Probation

4    Officer, and I expect that the Probation Officer will

5    listen and determine whether there should be a

6    modification in your payment schedule and if a

7    modification is warranted, then make that recommendation

8    to me, and I'm likely to follow it, unless I think that

9    there's some reason not to do so.

10           The point is, I don't see why you, alone among

11   the hundreds of defendants I've had, needs to be coming

12   before me to get an adjustment in his payment schedule.

13   Again, that's a very, very rare in my experience.

14           So, yeah, I will rely on you and Probation

15   Office to, you know, work together to address whatever

16   unexpected problems might arise that complicate your

17   ability to pay $400 a month.  If we need to have another

18   hearing, of course we will, but I'm hoping that it won't

19   be necessary.

20           THE DEFENDANT:  Maybe I'll have another heart

21   attack and just die.

22           THE COURT:  Sorry?

23           THE DEFENDANT:  It will please the Court.

24           THE COURT:  I'm sorry?

25           THE DEFENDANT:  I could maybe have another heart

 1    attack and just die if it will please the Court.

 2              THE COURT:  The motion for early termination of

 3    supervision is denied because of your obligation to pay

 4    restitution.

 5              The statute says that in imposing a sentence and

 6    in modifying conditions of supervision, the Court needs to

 7    consider the need for restitution to be paid to victims,

 8    and here that need is clear and so early termination of

 9    your supervision would be contrary to law.

10              THE DEFENDANT:  I wish the judge in the David

11    Price case said the same thing where he -- because I

12    received no restitution.  As you know, I was a victim.

13              THE COURT:  Yeah, there are some people who go

14    through life as victims and there are some who do not.

15    There are some who wallow in that and there are some who

16    rise above it, and one might have hoped, Mr. Rivernider,

17    that you might have fared better.  I don't know what else

18    I can do to give you your best chance, but it raises a

19    question I wanted to ask.

20              The Probation Office reports that a

21    psychological evaluation was done and a determination was

22    made that there was no diagnosis.

23              Do you have any information about that,

24    Mr. Frost?

25              MR. FROST:  I'm sorry, Your Honor.  I was

1    looking at something in the statute.  Could you repeat

2    that?

3             THE COURT:  The psychological evaluation that is

4    referenced in the record.  Are you privy to that?

5             MR. FROST:  The psychological evaluation from

6    the original underlying case?

7             THE COURT:  No.  My understanding is that the

8    Probation Office called on Mr. Rivernider to have a

9    psychological assessment.

10            MR. FROST:  I don't have that, Your Honor.  I

11   have not seen that.

12            THE COURT:  Was a written report done of that

13   evaluation, Mr. Rivernider?

14            THE DEFENDANT:  It happened November of 2020.  I

15   was -- just before Thanksgiving.  I remember sitting in a

16   car, having a conversation with them, and my understanding

17   was that there was no issue.

18            THE COURT:  No written report was made?

19            THE DEFENDANT:  It would of gone to Probation.

20            THE COURT:  You didn't see it?  If there was

21   one, you didn't see it?

22            THE DEFENDANT:  No.

23            THE COURT:  All right.  I'll assume that there

24   was none.

25            As I mentioned, at least once before in deciding

1  that the supervised release term should be five years, in

2  addition to the need to provide victims with restitution I

3  considered that it would give Mr. Rivernider access to

4  mental health care, free of charge if necessary.  And

5  given all that I know about Mr. Rivernider, given the

6  previous evaluations, I would of thought that that might

7  of been of some assistance to Mr. Rivernider, but

8  apparently not.

9         So, I think that takes care of what we need to

10 do.

11        PROBATION DEPARTMENT:  Yes, Your Honor.

12        I just want to clarify that Mr. Rivernider will

13 continue on supervised release under the same terms and

14 conditions with the modified restitution schedule?

15        THE COURT:  Yes, thank you.

16        Anything else?

17        MR. SCHMEISSER:  Your Honor, just to clarify

18 since there has been some disagreement as to exactly what

19 the terms are for incurring credit card charges more than

20 $250.  The written -- my understanding is that the written

21 instruction is what will govern going forward.  In other

22 words, not the oral -- what the Court orally may have

23 explained at sentencing, but in fact what is contained in

24 the written orders.

25        THE COURT:  Yes.  Thank you.  I appreciate the

1    point.

2              Under the law, as I understand it, the burden is

3    on Mr. Rivernider to prove his inability to pay

4    restitution.  And, you know, if Mr. Rivernider can

5    persuade me that he can't pay $400 a month, he's welcome

6    to do so.

7              Similarly, if he believes that this condition

8    prohibiting him from incurring credit card expenses in

9    excess of $250 is unreasonable given his business and the

10   way needs to entertain people and the amounts that he can

11   incur in the course of a couple of lunches or dinners,

12   he's welcome to do that too.  Nothing is carved in stone.

13              THE DEFENDANT:  Your Honor, I would ask then can

14   I get a credit card, a Wawa credit get card to get gas

15   when necessary?

16              THE COURT:  I don't see why not.

17              THE DEFENDANT:  Thank you.

18              MR. FROST:  I'd make that request on behalf of

19   Mr. Rivernider.

20              THE COURT:  I don't see why not.

21              I mean, the point here, Mr. Rivernider, is not

22   to make life difficult for you, it's not to add to your

23   pain, but to see to it that you comply with your legal

24   obligations, provided that the expectation is reasonable;

25   so, you know, if you need a credit card for gas for work,

1    why not, why not.

2         MR. SCHMEISSER:  And, Your Honor, along those

3    lines, just so we're very clear, the -- as my

4    understanding the special condition that in terms of

5    opening lines of credit or incur other indebtedness

6    without prior permission of Probation Office, so my

7    understanding what the Court is saying today is that if

8    the Defendant wants to get additional credit cards or open

9    other lines of credit, that's a conversation to have with

10   the Probation Office.  The Probation Office is first in

11   sort of the admonitions the Court has given this morning,

12   and will take those into consideration, but at the end of

13   the day, you are not sort of giving the Defendant

14   carte blanche to go open any line of credit.  There should

15   be a discussion with the Probation Office.

16         THE COURT:  No.  The conditions of probation are

17   intended to give the Probation Office an opportunity to be

18   informed of the Defendant's financial situation rather

19   than having the Defendant go off on his or her own without

20   disclosure to Probation Office, and at the same time

21   provide the Probation Office with needed flexibility in

22   attending to whatever need might arise under the

23   jurisdiction of the Court, which retains the judicial

24   authority to enter orders if and when necessary.

25         So as commonly happens, the individual on

1   supervision meets with the Probation Office or speaks with

2   Probation Office by phone and says:  Here's my situation.

3   I don't think I can pay the $400 this month because I just

4   got whacked with this unexpected expense and it's a

5   necessary expense, an essential expense, not

6   discretionary.  What am I going to do?

7          And Probation Officer has an opportunity to say:

8   I understand.  Don't worry about it.  How much can you pay

9   this month?  Pay that amount and you'll make up for the

10  difference later on.

11         Similarly, the defendant says:  Gee, I find that

12  not having a credit card is impairing my ability to make

13  commissions and I therefore think it would be reasonable

14  if I got a credit card on the understanding that I will

15  keep you informed of its use.  I don't anticipate having

16  to put more on the card as business expense than "X" per

17  month and that's what I'd like to be able to do.

18         Probation Office, again, can listen to it,

19  consider it and decide yeah, that makes sense or not.  But

20  you have the conversation, and you turn to the Court only

21  in the event that there's simply no way to come to an

22  agreement.

23         The Probation Office in that way is called on to

24  have an ongoing interaction with the individual which the

25  Court does not have and is not expected to have.

1          And, again, to my experience, 99 times out of

2     100 the Court doesn't get involved.

3          MR. FROST:  Your Honor, I think the Court going

4     through that is helpful because I think to the extent we

5     need to bring that to the attention of Probation in

6     Florida, we have a transcript if we need to.

7          I just -- my concern is that so long as

8     Mr. Rivernider is in violation status, I know that this

9     became an issue for travel requests and the like with the

10    Florida Probation Office.  They have a policy that they

11    won't grant, you know, modifications for travel when a

12    person is in violation status and so my concern would be

13    that in light of what the Court said, that Mr. Rivernider,

14    so long as he is in violation status with something

15    hanging over his head that I don't know whether that,

16    under their policies, would prevent them from considering

17    some of the things that you've just outlined, you know,

18    can he have a credit card, can he -- does he have an issue

19    this month because of significant expenses.

20         I just -- given, I don't have a lot of

21    experience with that office, you know that's a concern I

22    have, that I think the give and take that you just

23    described may be more difficult so long as he's considered

24    to be in violation status.

25         THE COURT:  Well, I've said what I think the

1    Probation Office should do and I'll leave it at that.

2              MR. FROST:  Okay.  Thank you.

3              THE COURT:  Anything further?

4              MR. SCHMEISSER:  Not from the Government, Your

5    Honor.  Thank you.

6              MR. FROST:  Nothing further, Your Honor.

7              THE COURT:  Thank you.  We can adjourn.

8              (The Court exited at 11:41 a.m.)

9              (* * * * *)

                          C E R T I F I C A T E

          I, Alicia A. Cayode Kyles, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.

/s/_____

ALICIA A. CAYODE KYLES, RMR
Official Court Reporter
United States District Court
450 Main Street, Room 320
Hartford, Connecticut 06103
(860) 509-8743